**Q–T MARKETS, INC., doing business as, Apollo Supers, a Colorado Corporation, Plaintiff,**

**and**

**John C. Sullard et al., Additional Parties Plaintiff,**

v.

**The FLEMING COMPANIES, INC., a Kansas Corporation, Defendant.**

**Civ. A. No. C–2484.**

United States District Court, D. Colorado.

April 30, 1975.

---

Richard H. Shaw and Robert C. Roth, Jr. of Shaw & Coghill, Denver, Colo., for plaintiffs.

Walter A. Steele of White & Steele, Denver, Colo., and Bruce P. Bickner and H. Blair White of Sidley & Austin, Chicago, Ill., for defendant.

**1104**

## MEMORANDUM AND ORDER

MATSCH, District Judge.

The defendant has filed three motions for partial summary judgment, each of which is directed to different aspects of the claims for relief asserted by the plaintiff and by the additional parties plaintiff. This memorandum considers the first of those motions, filed December 17, 1974.

## UNCONTROVERTED FACTS

Upon consideration of the pleadings, pre-trial statements, depositions, interrogatories, admissions on file and the statements of counsel it appears that there is no substantial controversy concerning the following statement of material facts.

Q–T Markets, Inc. ("Q–T") was organized as a Colorado corporation in 1967 to acquire a number of retail food supermarkets located in the metropolitan area of Denver, Colorado which were owned and operated by Red Owl Stores, Inc., a vertically integrated chain store company which was terminating its business. The initial capital for the plaintiff corporation came from the contribution of its investors, an inventory loan from the American National Bank and a fixture loan from Red Owl Stores, Inc.

The Fleming Companies, Inc. ("Fleming") is a Kansas corporation engaged in the wholesale distribution of food and related supplies to retailers in several areas of the United States. Concurrently with the creation of Q–T, the defendant acquired the wholesale portion of the business of Red Owl Stores, Inc. thereby entering the Denver area market for the first time. Fleming is the owner of a trade name, "United Supers" and a service mark "U S" which are registered with the Patent Office and the Secretary of State of the State of Colorado.

From its inception until February, 1968 Q–T operating under the name "Apollo" obtained the inventory and supplies for its stores from Associated Grocers of Colorado ("A. G."), a non-profit cooperative with member stores throughout Colorado and in parts of Wyoming.

On February 20, 1968, Q–T and Fleming entered into an agreement by the signing of two documents. The first of these, headed "Agreement" grants Q–T a "franchise" to establish and conduct a retail food business in accordance with the "United Super Sales-Service Plan Agreement" which is the heading of the second document. Copies of these two documents are attached to the complaint as Exhibits A and B.

Under the agreement the plaintiff obtained the right to use the United Super tradename and mark. Fleming became obligated to supply merchandise on credit in an amount up to $250,000., but not to exceed the amount of two weeks' purchases until April 15, 1969 at which time the amount then owing in excess of one week's purchases was to be converted into an interest free note to be paid in three equal annual installments. It was also agreed that upon plaintiff's request, Fleming would refinance, at an interest rate of 4.5% add on, an amount of $60,000. owed by plaintiff to A. G. for the purchase of equipment installed during the remodeling of one of the Apollo stores. The parties also agreed to engage in the development of new retail locations with Fleming to provide such planning and financing of the remodeling of stores as shall be agreed upon.

In the agreement Q–T promised to obtain its inventory requirements from Fleming, to use the Fleming retail accounting service, to cooperate with Fleming's retail advertising programs and to cooperate with the United Super program. The sales-service plan agreement was terminable upon ten days written notice by either party.

Beginning in March, 1968 and continuing until the termination of plaintiff's business by the foreclosure of the American National Bank and Red Owl loans in April, 1970, Q–T did purchase from or through Fleming. The

$250,000. credit limit was exceeded and corporate notes were written. Additionally, in September, 1969, the individuals who are the additional plaintiffs executed a note for $100,000., which amount Fleming credited to the corporation's open account. The makers of this note dispute that application and claim that they were defrauded.

### Injunction and Cancellation of Debts

The plaintiff and additional plaintiffs ask for an order permanently enjoining the collection of the open account, corporate notes and the individuals' note, together with a decree declaring those obligations to be void on the theory that they arose out of acts which constitute violations of the Sherman Act, the Clayton Act and a Colorado statute.

■ The requested remedy is not available to the plaintiff and additional plaintiffs under the Federal laws. While Sec. 16 of the Clayton Act (15 U.S.C. § 26) authorizes injunctive relief against "threatened loss or damage by a violation of the antitrust laws . . ." there is clear and consistent authority limiting any invalidation to those situations where the enforcement of the debt or contract would make the Courts " . . . a party to the carrying out of one of the very restraints forbidden . . . ." Kelly v. Kosuga, 358 U.S. 516, 520, 79 S.Ct. 429, 432, 3 L.Ed. 2d 475 (1959). See, Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); Continental Wall Paper v. Louis Voight & Sons, 212 U.S. 227, 29 S.Ct. 280, 53 L. Ed. 486 (1909) and Atlantic Richfield v. Malco Petroleum, Inc., 471 F.2d 1258 (6th Cir. 1972).

The debts in issue are the subject of a counterclaim by Fleming in this proceeding. While they result from the relationship arising out of the February 20, 1968 agreements, they are not direct obligations in those contracts. If the claimed violations exist, the plaintiff and additional plaintiffs have an ade-

quate remedy in the recovery of treble damages under Sec. 4 of the Clayton Act. (15 U.S.C. § 15).

This conclusion does not affect the third and fourth claims for relief asserted by the additional plaintiffs because they are based upon contentions of fraud in the inducement and breach of contract which are not involved in the defendant's motion for summary judgment.

The second claim for relief of the corporate plaintiff and of the individual additional plaintiffs seeks avoidance of these claimed debts under Colorado's statutes concerning restraint of trade. C.R.S. §§ 6–4–101 through 109 (1973).[1] They include the following provision:

> All contracts or agreements made by any person, firm, corporation, or association while a member of any combination, conspiracy, trust, or pool prohibited under this article which are founded upon, or are the result of, or grow out of, or are connected with any violation of this article, either directly or indirectly, shall be void, and no recovery thereon or benefit therefrom shall be had by or for any such person, firm, corporation, or association. Any payments made upon, under, or pursuant to such contract or agreement to or for the benefit of such person . . . may be recovered in an action by the party making the payment . . . but suit for recovery shall be brought within six years after the making of said contract or agreement. (C.R.S. § 6–4–106 (1973)).

It is difficult to determine whether this statute has any applicability in this case. The first uncertainty is what is prohibited under the Colorado act. The proscriptions of conduct are found in the following sections of the article:

> 6–4–101. *Illegal restraint of trade.* Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is de-

1. Formerly C.R.S. §§ 55–4–1 to 9 (1968).

clared illegal. Every combination, conspiracy, trust, pool, agreement, or contract intended to restrain or prevent competition in the supply or price of any article or commodity constituting a subject of trade or commerce in this state which controls in any manner the price of any such article or commodity, fixes the price thereof, or limits or fixes the amount or quantity thereof to be manufactured, produced, or sold in this state, or monopolizes or attempts to monopolize any part of the trade or commerce in this state, is declared an illegal restraint of trade.

\* \* \* \* \* \*

6–4–102. *Unlawful conspiracy.* Every person, corporation, copartnership, trustee, or association who, either as principal or agent, makes any contract or engages in any combination, conspiracy, trust, pool, or agreement declared unlawful or an illegal restraint of trade under this article, or who combines or conspires with any other person, corporation, copartnership, association, or trustee to monopolize any part of the trade or commerce in this state is guilty of an unlawful conspiracy and, upon conviction thereof, shall be punished as provided in section 6–4–107.

All violations of the article are made misdemeanors by § 6–4–107.

■■ The entire article was enacted in 1957 and there are no cases from Colorado's courts interpreting any of this language. While there are some similarities, the language of the Colorado statute differs from that used in Sections 1 and 2 of the Sherman Act. (15 U.S.C. §§ 1, 2). Because of those differences it would be unwarranted to assume that the Colorado legislature intended to adopt the case law interpreting the Federal statutes. Moreover, the incorporation of Federal cases approach would

necessarily be limited to cases before 1957 since it may not be assumed that the legislators could have presumed such new developments as Fortner Enterprises v. U. S. Steel, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). It is therefore concluded that the claims for relief based upon the Colorado statute must be considered solely in the context of the literal meaning of the language used by the legislature with the admonition that criminal statutes must be construed strictly.

The two sentences in § 101 appear to define three different types of illegal restraints of trade. The first sentence declares illegal every contract or combination in restraint of trade or commerce where the contract or combination is in the nature of a trust or conspiracy. The significant difference between this Colorado statute and § 1 of the Sherman Act is that the latter makes illegal "every contract, combination in the form of trust *or otherwise,* or conspiracy, in restraint of trade or commerce . . ." (15 U.S.C. § 1, emphasis added). The omission of the words "or otherwise" from the Colorado act is significant because it means that Colorado does not prohibit a contract which may restrain trade or commerce but which is not in the nature of a trust or conspiracy.

The second sentence of § 101 does seem to prohibit a contract where there is a specific intention to restrain or to prevent competition in the supply or price of articles or commodities, or which controls the price of any such article or commodity, or limits or fixes the quantity to be made or sold in the state. The third definition of a restraint of trade is monopolization or attempted monopolization. Given the grammar of § 101,[2] it must be concluded that monopolization or attempted monopolization is limited to a combination, conspiracy, trust or pool because it is inconceivable

2. The pertinent language of § 6–4–101 is: ". . . Every combination, conspiracy, trust, pool, agreement, or contract . . . which . . . monopolizes or attempts to

monopolize any part of the trade or commerce in this state, is declared an illegal restraint of trade."

that a contract or agreement could, in itself, monopolize or attempt to monopolize trade or commerce.

 Under this analysis, the plaintiff's characterization of the February 20, 1968 documents as an illegal tying contract is irrelevant to the state statute because such contracts are not prohibited by it. The plaintiff and additional plaintiffs will have a remedy under the Colorado Restraint of Trade Act only to the extent that they can establish that there was a combination or conspiracy in restraint of trade or commerce in Colorado, or a combination or conspiracy fixing prices, or a combination and conspiracy which monopolized or attempted to monopolize trade or commerce in Colorado. The complaint does allege that the defendant was in combination or conspiracy with the plaintiff corporation and other retail outlets to fix resale prices and to control the amount or quantity of merchandise sold in the State of Colorado. If those allegations are established by the evidence on trial of this case, § 106 of the Colorado restraint of trade article may be applicable to the extent that the evidence shows that any of the indebtedness arises out of such particular violations as alleged. A general nullification of these claimed debts would not be a necessary result. Moreover, the question of the applicability of the doctrine of *in pari delicto* may have to be considered insofar as the evidence shows participation in an illegal combination or conspiracy by the parties plaintiff.

The parties plaintiff also seek avoidance of the debts raised in the counterclaim because they allege violations of the Colorado Unfair Practices Act, C.R. S. §§ 6–2–101 through 6–2–117 (1973).[3]

Secret rebates or refunds are prohibited by § 108 of that statute. Sections 103 through 107 prohibit other sales practices. The parties plaintiff urge the applicability of § 109 which prohibits recovery on any contract, express or implied made in violation of the provisions of §§ 103 to 108. Since the reference is "to" 108, that section is excluded and § 109 is inapplicable to secret rebates or refunds.

The parties plaintiff have urged that the defendant engaged in discriminatory sales in violation of § 103 of the Colorado Unfair Practices Act. For the reasons to be set out in a forthcoming memorandum opinion, it is concluded that no violation of that section is involved in this case.

The conclusion then is that summary judgment may not now be granted on the second claim for relief of the plaintiff corporation and the additional parties plaintiff because they must be given an opportunity to prove the allegations of a combination or conspiracy and its effects within the scope of applicable Colorado law.

### Tying Arrangement

The defendant moves for a summary judgment of dismissal for those portions of the plaintiff corporation's first claim for relief which allege that the defendant violated Section 1 of the Sherman Act by compelling the plaintiff to enter into a tying arrangement in the agreement of February 20, 1968.

In affirming an injunction entered on a motion for summary judgment in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), the Supreme Court declared that there was a *per se* violation of Section 1 of the Sherman Act where International Salt Co. leased patented salt products machines with the requirement that the lessees purchase all salt and salt products used in those machines from the leasing company.

The same result was reached in Northern Pacific R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958) wherein the railroad was enjoined from inserting "preferential routing" clauses in deeds or leases re-

---

3. Formerly C.R.S. §§ 55–2–1 to 17 (1963).

quiring the grantee or lessee to ship all commodities manufactured or produced on the land over the defendant's rail lines. The Court made the following definition of a tying arrangement:

For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. . . . (Id. at 5–6, 78 S.Ct. at 518 (footnotes omitted)).

The *per se* illegality rule was applied in United States v. Loew's, Inc., 371 U. S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) to the practice of motion picture film distributors in requiring television stations to purchase packages of feature films for television exhibition. Thus less desirable movies were tied to the more desirable ones as a condition to obtaining the latter. The Court held that it was not necessary to have sufficient market dominance to control price and to exclude competition; but, the Court affirmed the trial judge's finding that each copyrighted film was itself a unique product which gave sufficient economic power to impose a restraint on free competition in the tied product.

In reversing a summary judgment of dismissal of a private action for damages and injunction, the Supreme Court in Fortner Enterprises v. U. S. Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L. Ed.2d 495 (1969) extended the concept of a tying product to credit. The majority of the Court concluded that if the plaintiff could show that the credit extended was sufficiently unique it could be a tying product and the requirement that the borrower purchase the defendant's products would be illegal if the tied product involved a substantial enough amount of business in dollar volume so as not to be *de minimis*.

The following language from page 505, page 1259 of 89 S.Ct. of the opinion is particularly significant to the contentions made by Q–T about Fleming:

"We do not mean to accept petitioner's apparent argument that market power can be inferred simply because the kind of financing terms offered by a lending company are "unique and unusual." We do mean, however, that uniquely and unusually advantageous terms can reflect a creditor's unique economic advantages over his competitors."

After remand the *Fortner* case was tried and the district judge entered a directed verdict for the plaintiff on the issue of liability. That was reversed on appeal in Fortner Enterprises, Inc. v. United States Steel Corp., 452 F.2d 1095 (6th Cir. 1971) cert. denied, 406 U.S. 919, 92 S.Ct. 1773, 32 L.Ed.2d 119 (1972). The Circuit Court concluded that there was sufficient uncertainty in the record on the question of whether the defendant had sufficient economic power in the credit market to require that issue to go to the jury. The Court noted that the case differed from *International Salt, supra,* where the tying product was patented; from *Loew's, Inc., supra,* where it was copyrighted; and *Northern Pacific Railway Co., supra,* where there was physical uniqueness of the land. The Court summarized the issue in the following language at page 1100 of its opinion:

The focus of our present inquiry is whether the Credit Corporation possessed leverage in the credit market (the 'tie' here being the extension of credit) sufficient to induce buyers in the market for prefabricated houses (the 'tied' product) to accept a less competitive product.

█ Fleming argues that there is only one product and one product market presented in this case. The defendant says that the only credit extended was for the sales of products to the plaintiff. Q–T contends that its evidence will show that the agreement was for package fi-

nancing which was unique and which was not available from any other source. If the evidence is adequate such uniqueness may, indeed, establish both a separate product market and coercive economic power in that market. Upon the basis of the record now made, I cannot conclude as a matter of law that the February 20, 1968 agreement and the defendant's course of conduct with the plaintiff and its other retailers did not constitute an illegal tying arrangement. Moreover, *Fortner, supra,* and the related cases establish requirements for *per se* violations of Section 1. Even if the evidence is inadequate for that result, the plaintiff may show that the result and effect of the agreement was anticompetitive and a restraint of trade within the contemplation of the general standards of the Sherman Act.

■ The plaintiff also contends that the trademark and trade name are another tying product in this case. In Siegel v. Chicken Delight, 448 F.2d 43 (9th Cir. 1971) cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972) it was held that a trademark is entitled to a presumption of coercive power where it is distinctive and possesses established consumer acceptance. Counsel for the plaintiff conceded at the hearing on the summary judgment motions on April 19, 1975 that there was no evidence that the United Supers name and the design mark here have any such established acceptance. Accordingly, it would appear that there could be no showing of an illegal tying agreement connected with the trademark and trade name.

### Exclusive Dealing Contract

■ Section 3 of the Clayton Act (15 U.S.C. § 14) provides in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods . . . on the condition . . . that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor . . . where the ef-

fect of such lease, sale or contract . . . may be to substantially lessen competition or to create a monopoly in any line of commerce.

This section prohibits agreements to refrain from purchasing the commodities of a competitor of a seller where the effect is a substantial lessening of competition. Because the sales-service plan required Q–T to purchase inventory requirements from The Fleming Companies, plaintiff contends this is the equivalent of an exclusive dealing contract. To determine the legality of such a contract, the Supreme Court has prescribed a three step analysis in Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961):

*First,* the relevant line of commerce . . . must be *determined, where it is in controversy, on the basis* of the facts peculiar to the case. *Second,* the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practically turn for supplies. . . . *Third,* and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. *Id.* at 327–28 (footnotes omitted).

In this case the parties plaintiff contend that the relevant geographic market is the Denver metropolitan area and that the product market is the wholesale distribution of food and related products to independent retail supermarkets which are not integrated vertically. To prevail on this claim it will be necessary that Q–T introduce evidence to show that these are, in-fact, the relevant markets and to show the effect on competition within those markets. Those are essentially fact questions for jury determination in this case. The only possible basis for granting a summary judgment on this claim is that because there was a provision for termination on ten days notice, the Sales-Service Plan Agreement could not possibly foreclose competition

as a matter of law. That argument is countered by the plaintiff's offer to show through evidence that once it signed these agreements and changed from its A. G. affiliation it became so dependent upon the credit arrangements of Fleming as to become captive thereby rendering the termination clause meaningless. That the plaintiff is entitled to attempt to prove. Accordingly it must be concluded that no summary judgment can be granted on this claim.

Upon the foregoing, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, it is

Ordered that the foregoing statement of facts are specified as the facts which appear without substantial controversy and that further proceedings for the trial of this civil action shall be in accordance with the foregoing conclusions concerning the law to be applied in this case.