The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

NORTH AVENUE FURNITURE AND APPLIANCE, INC.; Harvey Townsley; Leo Hyland; and Harland Jacob, Defendants-Appellees.

No. 80SA505.

Supreme Court of Colorado, En Banc.

May 24, 1982.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., B. Lawrence Theis, Jill A. Gross, Asst. Attys. Gen., Denver, for plaintiff-appellant.

Harshman & Deister, Thomas M. Deister, Grand Junction, for defendants-appellees.

QUINN, Justice.

The People appeal from an order dismissing an indictment charging the defendants with price-fixing in violation of section 6–4–101, C.R.S.1973 (1981 Supp.), the Colorado Antitrust Statute. The district court concluded that section 6–4–103(2), C.R.S.1973, which provides that "[t]he labor of a human being is not a commodity or article of commerce," exempted the defendants' activities from antitrust prosecution. Disagreeing with this construction of the so-called "labor exemption" of the antitrust statute, we reverse and remand for reinstatement of the indictment.

I.

The defendants in this proceeding are: North Avenue Furniture and Appliance, Inc. (North Avenue), a Colorado corporation engaged in the floor covering retail business in Grand Junction, Colorado; Harland Jacob, who was North Avenue's manager; Leo Highland, the manager of Don Felsen, Inc., another floor covering store in Grand Junction; and Harvey Townsley, who operated a carpet installation service in Grand Junction. North Avenue and Don Felsen, Inc., are the two largest retail carpet stores in Grand Junction and do not have installers on their payroll. They contract out installation services to independent carpet installers, such as Harvey Townsley, who then submit a statement to the retail store at the end of each installation job. The statements are based on the amount of carpet installed rather than the number of hours spent on the actual installation. The rates for carpet installation are published on price lists upon which retailers rely in quoting installed prices to their customers.

During January 1980 Harland Jacob discussed with Harvey Townsley and other independent installation contractors the prospect of increasing the price of their services. On February 1 the three defendants, Jacob, Townsley and Leo Highland, reached an agreement which increased the rate for installation by twenty-five cents per yard. Townsley notified other installers of a mid-February meeting to discuss the price increases, and a notice of the meeting was displayed at Glenn's Flooring, the primary floor covering installation supply store in Grand Junction. On February 18 or 19 Townsley met with approximately twenty-five independent installers at Glenn's Flooring and discussed the price increases. The installers approved the twenty-five cents per yard increase as well as a minimum charge increase of ten dollars for each installation job. The installers agreed to adhere to these increases and to approach floor covering retailers with the new prices.

After the meeting a new price list was typed by a North Avenue employee and several copies were made at Townsley's expense and left at Glenn's Flooring with

instructions that they be made available to installers when they placed a purchase order for supplies.[1] Although some retailers were reluctant to accept the new rates, they generally agreed to follow them effective March 1, 1980. On February 27 the attorney general received an anonymous complaint regarding the price increase agreement and initiated a grand jury investigation which resulted in the return of an indictment on May 13, 1980.

■ The defendants filed a motion to dismiss the indictment, contending that the agreement for the increased carpet installation charge "dealt solely with the price of human labor" and, thus, was within the labor exemption of section 6–4–103(2), C.R. S.1973.[2] In opposing the dismissal the attorney general, relying primarily upon United States Supreme Court decisions addressing the Sherman and Clayton Acts, urged that the labor exemption be restricted to legitimate labor union activities relating to the terms and conditions of employment. The court rejected this narrow construction of the labor exemption and dismissed the indictment. It ruled that carpet installation "is at least as much 'labor' as plumbing, carpeting, welding or any other form of the building trades," and, in its view, the labor exemption created by section 6–4–103(2) immunized the defendants' activity from antitrust prosecution.[3] We conclude that the district court misapprehended the nature and scope of the labor exemption in its order of dismissal.

1. The price list available at Glenn's Flooring contained all the increased prices of installation, except the ten dollar increase in the minimum charge. The minimum charge increase was not incorporated into the price list because it did not meet with the approval of North Avenue.

2. The defendant also filed separate motions to dismiss the indictments pursuant to section 16–5–204(4)(k), C.R.S.1973 (1978 Repl.Vol. 8), for lack of probable cause. The district court denied these motions and this ruling is not before us at this time.

3. The court's ruling, in pertinent part, states:

"The theme of the alleged conspiracy is the agreement among the conspirators to raise the prices for 'floor covering installation services.'

"If this postulation is permissible, then the integrity of the indictment is impregnable because the designation of floor covering as *services* obviates the bar of the *labor* exemption specifically provided in the statute. Neither reason nor logic support such an arbitrary classification; this operational bootstrap indicates quite clearly a benighted understanding of the nature of floor covering work; reason and logic, as well as cursory observation, support the conclusion that such work is at least as much 'labor' as plumbing, carpentering, welding or any other of the building trades; the attorney general ingenuously urges that the exemption provided by C.R.S.1973 6–4–103(2) "THE LABOR OF A HUMAN BEING IS NOT A COMMODITY OR ARTICLE OF COMMERCE" was provided for the peculiar benefit of union 'laborers' as distinct from others; *arguendo*—collective bargaining agreements have no impact on prices or competition, but all other agreements do; in the avoidance of constitutional infirmity, trial courts may only follow a plain reading of the statutory exemptions; the suggestion of the attorney general that the federal judiciary 'carved out' a consensus that this exemption referred only to 'union labor' to the exclusion of any other 'labor' is not binding upon state courts."

In rejecting the decisions of the United States Supreme Court construing the federal labor exemption in antitrust litigation, the district court relied on *Q–T Markets, Inc. v. Fleming Companies, Inc.,* 394 F.Supp. 1102 (D.Colo.1975), which considered the application of the Colorado antitrust statute to a tying arrangement between a retail food supplier and a retail food operator. The federal district court, interpreting the words of section 6–4–101 in a literal manner and focusing on minor differences between the Colorado statute and the Sherman Act, ruled that "it would be unwarranted to assume that the Colorado legislature intended to adopt the case law interpreting the Federal statutes," 394 F.Supp. at 1106, and concluded that tying agreements were not prohibited under the Colorado statute. We believe, however, that federal and state antitrust statutes serve complementary purposes and, in view of their common goals of preserving free competition and protecting the public against illegal restraints of trade, the antitrust decisions of the United States Supreme Court are entitled to careful consideration in determining the meaning and scope of the Colorado statute. We therefore reject the contrary assumption implicit in *Q–T Markets. See* Note, *Colorado Antitrust Law: Untied and Drifting,* 48 *Colo.L. Rev.* 215 (1977).

## II.

Because we have not previously construed the provisions of the Colorado Antitrust Statute, section 6–4–101, *et seq.*, C.R.S.1973, a brief review of the sources of this statute is in order. The first Colorado Antitrust Statute was enacted in 1913 and was declared unconstitutionally vague by the United States Supreme Court in 1927. *Cline v. Frink Dairy Co.*, 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146 (1927). The present antitrust statute was enacted in 1957 and was modeled on Wisconsin's antitrust statute, W.S.A. § 133.01 et seq. (1939),[4] which in turn was based on relevant portions of the Sherman Act of 1890, 15 U.S.C. § 1 (1976),[5] and the Clayton Act of 1914, 15 U.S.C. § 17 (1976).[6]

Section 6–4–101, C.R.S.1973 (1981 Supp.), which contains the "illegal restraint of trade" proscription, provides as follows:

[4] In opposing the defendants' motion to dismiss, the attorney general filed with the district court the affidavit of David J. Clarke who drafted the Colorado Antitrust Statute. The affidavit, after reciting Clarke's service with the Antitrust Division of the United States Department of Justice from 1938 to 1948 and his election to the state senate in 1956, continues, in pertinent part:

"I decided that the antitrust statute enacted in Wisconsin, as set forth in a volume of state antitrust laws, prepared by the Marketing Laws Survey and published as a WPA project in 1940, provided the best model. A copy of the Wisconsin law is attached hereto as Exhibit A. The volume is held at the library of the University of Denver College of Law, No. T 14, M 3452S.

"I then drafted the bill which was subsequently enacted as Senate Bill No. 200 using the Wisconsin statute as a model.

"In drafting this legislation it was my intent to follow the substantive provisions of the Wisconsin statute so that any Court decisions interpreting the Wisconsin statute could be cited to the Colorado courts.

"I did make certain changes regarding the penalties to be applied, such as the elimination of the provision for treble damages in civil cases, because I thought the new statute should be 'on the books' for a while before private actions for treble damages could be instituted.

"To the best of my recollection, Senate Bill No. 200 was enacted without amendment as I drafted it."

"Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is declared illegal. Every combination, conspiracy, trust, pool, agreement, or contract intended to restrain or prevent competition in the supply or price of any article or commodity constituting a subject of trade or commerce in this state which controls in any manner the price of any such article or commodity, fixes the price thereof, or limits or fixes the amount or quantity thereof to be manufactured, produced, or sold in this state, or monopolizes or attempts to monopolize any part of the trade or commerce in this state, is declared an illegal restraint of trade."

The labor exemption, which substantially duplicates section 6 of the Clayton Act, is contained in section 6–4–103, C.R.S.1973:

[5] Section 1 of the Sherman Act provides, in part, that "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1976). Section 3 of the Sherman Act, 15 U.S.C. § 3 (1976) similarly proscribes activities in "restraint of trade or commerce."

[6] Section 6 of the Clayton Act, after declaring that "the labor of a human being is not a commodity or article of commerce," states that the antitrust laws shall not be construed to forbid the existence of labor, agricultural or horticultural organizations, instituted for the purposes of mutual help. 15 U.S.C. § 17 (1976). Section 20 of the Clayton Act prohibits federal courts from issuing injunctions in employment disputes concerning terms or conditions of employment, unless necessary to prevent irreparable injury to a property right. 29 U.S.C. § 52 (1976).

The Wisconsin Supreme Court consistently has construed the Wisconsin antitrust statute in accordance with federal case law. *See, e.g., Wisconsin v. Waste Management,* 81 Wis.2d 555, 261 N.W.2d 147 (1977), *cert. denied sub nom. Waste Management of Wisconsin, Inc. v. Wisconsin,* 439 U.S. 865, 99 S.Ct. 189, 58 L.Ed.2d 175 (1978); *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis.2d 402, 198 N.W.2d 363 (1972); *Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 157 Wis. 604, 147 N.W. 1058 (1914), *cert. denied* 249 U.S. 610, 39 S.Ct. 291, 63 L.Ed. 800 (1919).

"(1) Nothing in this article shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations instituted for the purpose of mutual help, or engaged in making collective sales or marketing for its members or shareholders of farm, orchard, or dairy products produced by its members or shareholders, and not having capital stock or conducted for profit or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade under this article.

"(2) The labor of a human being is not a commodity or article of commerce."

■ The historical backdrop to the Sherman and Clayton Acts and the purpose of their enactment are helpful to an understanding of our resolution of the issue raised here. The Sherman Act, which prohibits contracts or combinations in restraint of trade or commerce, contained no language expressly exempting labor union activities from its sweep. In response to the complaints of labor unions against the application of the act to their activities, Congress in 1914 passed the Clayton Act. However, the Clayton Act precipitated new litigation and renewed controversy regarding the status of trade unions. As the Supreme Court observed in *United States v. Hutcheson*, 312 U.S. 219, 230, 61 S.Ct. 463, 465, 85 L.Ed.2d 788, 792 (1941):

"It was widely believed that into the Clayton Act courts read the very beliefs which that Act was designed to remove. Specifically, the courts restricted the scope of § 20 to trade union activities directed against an employer by his own employees. *Duplex Co. v. Deering* [254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921)]. Such a view, it was urged, both by powerful judicial dissents and informed lay opinion, misconceived the area of economic conflict that had best be left to economic forces and the pressure of public opinion and not subjected to the judgment of courts.... Agitation again led to legislation and in 1932 Congress wrote the Norris-LaGuardia Act. Act of March 23, 1932, 47 Stat. at 70, 29 U.S.C. §§ 101–115." [7]

■ Federal antitrust legislation is designed to preserve free competition and to protect the public against the evils caused by economic agreements in restraint of trade. Federal labor law, on the other hand, encourages voluntary economic agreements between employers and employees by recognizing and protecting the rights of employees to organize within appropriate units and to bargain collectively regarding wages, hours, and other working conditions. The labor exemption to antitrust prosecution represents an accommodation between these discrete national policies. *See Casey & Cozzillo, Labor-Antitrust: The Problem of Connell and a Remedy that Follows Naturally*, 1980 Duke L.J. 235. State antitrust legislation serves the important function of protecting the public against illegal trade restraints beyond the reach of federal law, without however undercutting the legitimate rights of employees to engage in lawful, concerted activities for the purpose of improving their wages, hours and other conditions of employment. *See* section 8–3–106, C.R.S.1973. Given the substantial similarity in text and purpose present in the federal and state antitrust statutes, we believe that federal decisions construing the Sherman and Clayton Acts, although not

7. The Norris-LaGuardia Act "explicitly formulated the 'public policy of the United States' in regard to the industrial conflict, and by its light established that the available area of union activity was not to be restricted, as it had been in the *Duplex* case, to an immediate employer-employee relation." *United States v. Hutcheson*, 312 U.S. 219, 231, 61 S.Ct. 463, 466, 85 L.Ed. 788, 792–93 (1941). Thus, the Sherman, Clayton and Norris-LaGuardia Acts must be read as interlacing statutes in determining whether union or employee conduct constitutes an antitrust violation. *Id.*

necessarily controlling on our interpretation of the Colorado law, are nevertheless entitled to careful scrutiny in determining the scope of the state antitrust statute.

### III.

We now turn to the specific issues of this case. The People contend that the labor exemption of section 6–4–103 should be narrowly restricted to bona fide labor union activities, such as collective bargaining to improve wages and other conditions of employment, and should not be construed to encompass, as here, an agreement by independent contractors to fix the price at which their carpet installation service may be purchased. The defendants on the other hand argue that all agreements relating to the labor of human beings, including those arising from economic interests shared by independent businessmen, are immune from antitrust sanctions by virtue of the labor exemption in section 6–4–103(2). Implicit in this issue relating to the scope of the labor exemption is the underlying assumption that the installation of carpet, although a service, is nonetheless a "trade" within the meaning of the antitrust statute. We first consider this threshold matter before addressing the scope of the labor exemption created by section 6–4–103.

### A.

In *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204 (1931), the Supreme Court considered whether the Sherman Act could be applied against persons who, in the course of engaging in the business of cleaning, dying and renovating wearing apparel, had agreed to perform such services at minimum and uniform prices. The Court rejected a narrow interpretation of the word "trade" and, instead, construed the term in a broader sense as "equivalent to occupation, employment, or business, whether manual or mercantile." 286 U.S. at 436, 52 S.Ct. at 610, 76 L.Ed. at 1209. More recent-

ly, in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court held that the practice of law was "trade or commerce" within section 1 of the Sherman Act and, therefore, a minimum fee schedule for a title examination of real estate, which was enforced by the Virginia Bar Association, constituted a form of illegal price fixing proscribed by the Act:

"The nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act, *Associated Press v. United States*, 326 U.S. 1, 7 [65 S.Ct. 1416, 1418, 89 L.Ed. 2013] (1945), nor is the public-service aspect of professional practice controlling in determining whether § 1 includes professions. *United States v. National Assn. of Real Estate Boards*, 339 U.S. [485] at 489 [70 S.Ct. 711, at 714, 94 L.Ed. 1007]. Congress intended to strike as broadly as it could in § 1 of the Sherman Act, and to read into it so wide an exemption as that urged on us would be at odds with that purpose.... Indeed, our cases have specifically included the sale of services within § 1. *E.g., American Medical Assn. v. United States*, 317 U.S. 519 [63 S.Ct. 326, 87 L.Ed. 434] (1943); *Radovich v. National Football League*, 352 U.S. 445 [77 S.Ct. 390, 1 L.Ed.2d 456] (1957). Whatever else it may be, the examination of a land title is a service; the exchange of such a service for money is 'commerce' in the most common usage of that term." *Goldfarb v. Virginia State Bar, supra*, 421 U.S. at 787–88, 95 S.Ct. at 2013, 44 L.Ed.2d at 585.

■ Clearly, the installation of carpeting for money is "trade or commerce" within the meaning of section 6–4–101. That the installation involves the exchange of a service for money, rather than the exchange of an article or commodity, is a distinction without antitrust significance. *See, e.g., National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1335, 55 L.Ed.2d 637 (1978); *American Medical*

*Assn. v. United States,* 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943).[8]

## B.

The pivotal question in this case is whether, notwithstanding the "trade" aspect of carpet installation service, the defendants are exempted from prosecution by reason of the labor exception of section 6–4–103(2). In contrast to the "trade or commerce" clause of section 1 of the Sherman Act, the labor exemption has been construed narrowly in light of its purpose, which is to permit employees to engage in organizational activity related to the improvement of wages, hours, and other conditions of employment. *Columbia River Packers Association, Inc. v. Hinton,* 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942), illustrates the narrow compass of the statutory exemption. There an association of fishermen operating as independent businessmen joined together in a union to regulate the terms under which they would sell fish to a fish processor. In holding that the fishermen were not protected against injunctive relief for a Sherman Act violation, the Supreme Court stated:

> "That a dispute among businessmen over the terms of a contract for the sale of fish is something different from a 'controversy concerning terms or conditions of employment, or concerning the association . . . of persons . . . seeking to arrange terms or conditions of employment' calls for no extended discussion. This definition and the stated public policy of the [Norris-LaGuardia] Act—aid to 'the individual unorganized worker . . . commonly helpless . . . to obtain acceptable terms and conditions of employment' and protection of the worker 'from the interference, restraint, or coercion of employers of labor'—make it clear that the at-

tention of Congress was focussed upon disputes affecting the employer-employee relationship, and that the Act was not intended to have application to disputes over the sale of commodities.

\*    \*    \*    \*    \*    \*

> "The controversy here is altogether between fish sellers and fish buyers. The sellers are not employees of the petitioners or of any other employer, nor do they seek to be. On the contrary, their desire is to continue to operate as independent businessmen, free from such controls as an employer might exercise. That some of the fishermen have a small number of employees of their own, who are also members of the Union, does not alter the situation. For, the dispute here, relating solely to the sale of fish, does not place in controversy the wages or hours, or other terms and conditions of employment, of these employees." 315 U.S. at 145–47, 62 S.Ct. at 521–22, 86 L.Ed. at 753–54.

Likewise, in *Los Angeles Local 626 v. United States,* 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962), where self-employed, independent grease peddlers joined a union for the purpose of increasing the margin between the price at which they purchased and sold their grease, the Court held that the peddlers were sellers of a commodity, and since their activity did not grow out of a labor dispute, they were not insulated from antitrust sanctions under the labor exemption.

The defendants do not dispute the effect of federal precedent on their exemption claim. Rather, they urge us to depart from that precedent and to construe the Colorado labor exemption to include all forms of service-oriented labor, whether performed by union, nonunion employees or independent businessmen such as themselves. The defendants center their argument on the dif-

8. In our decisions construing Colorado's prior antitrust statute, we have held that trade restraints in connection with service-oriented industries were subject to antitrust prosecution. *See, e.g., People v. Apostolos,* 73 Colo. 71, 213 P. 331 (1923) (shoe repair); *Johnson v. People,* 72 Colo. 218, 210 P. 843 (1922) (electrical contracting); *Campbell v. People,* 72 Colo. 213, 210 P. 841 (1922) (plumbing).

ference in textual sequence and arrangement between section 6 of the Clayton Act and section 6–1–103. Section 6 of the Clayton Act provides:

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." 15 U.S.C. § 17 (1970).

In contrast, section 6–4–103(1) does not contain the first sentence of the Clayton Act. Rather, this sentence is separately set out in subsection 6–4–103(2). Thus, the defendants conclude that the separation of the labor exemption into two subsections of section 6–4–103 manifests a legislative intent to exempt not only bona fide union activity but also all forms of human labor. We reject the defendants' proposed construction of the labor exemption.

■■■ Section 6–4–103(2) was originally enacted as part of a single section entitled "Organizations exempt." Colo.Sess.Laws 1957, ch. 142 at 369–70. The division of this original enactment into subsections first appeared in the compilation of 1973 Colorado Revised Statutes. Section 2–5–101, C.R.S. 1973 (1980 Repl.Vol. 1B), requires the revisor of statutes to compile, edit, arrange and prepare for publication "all the laws of the state of Colorado of a general and permanent nature." The revisor's duties, however, are limited to editorial changes which do not alter the substantive meaning of the law. Section 2–3–703, C.R.S.1973 (1980 Repl.Vol. 1B). In the case of the compilation and publication of the 1973 Colorado Revised Statutes, section 2–5–103(2), C.R.S.

1973 (1980 Repl.Vol. 1B), leaves no doubt about the limitations upon the revisor's authority:

"The revisor shall make no change in the substance of any statute but may make such changes in arrangement and terminology as will, in the judgment of the committee [of legal services], improve the style and clarity of the laws, yet preserve the intent, effect, and meaning of each statutory provision."

*See also* section 2–3–703 (the revisor's duties "shall be performed in such form and manner as to preserve the intent, effect, and meaning of any and every such statute revised"). With these limitations in mind, we cannot attach any substantive significance to the revisor's bifurcation of the labor exception into two separate subsections of section 6–4–103. The substantive content of section 6–4–103 remains identical to the original enactment in 1957 and, in accordance with the express legislative intent in reenacting prior law into the 1973 Colorado Revised Statutes, section 6–4–103 must be given effect as though a continuation of the original 1957 statute. Section 2–5–113(3), C.R.S.1973 (1980 Repl.Vol. 1B).

That subsection 6–4–103(2) does not broaden the scope of the labor exemption becomes apparent upon considering the identical language of section 6 of the Clayton Act. The statement "The labor of a human being is not a commodity or article of commerce" was first proposed as an amendment to the Clayton Act during the senate debate on the act. 3 *The Legislative History of the Federal Antitrust Law and Related Statutes* 2378–79 (E. Kintner ed. 1978). The text of this sentence was composed by Samuel Gompers, President of the American Federation of Labor. Annot., 9 L.Ed.2d 998, 1001 n. 9 (1964). The sentence mirrors to great extent Mr. Gompers' view, as stated to the House Committee on the Judiciary during the Clayton Act hearings, that it was "an outrage upon our language" to construe the Sherman Act as applicable to "men and women who own nothing but

themselves and undertake to control nothing but themselves and their power to work." 2 *The Legislative History of the Federal Antitrust Law and Related Statutes, supra,* at 1096. Viewed in this historical context, the first sentence of section 6 of the Clayton Act reflects a principle of national policy that employees should not be required to compete in the sale of their labor as if it were a commodity or article of commerce. By itself, however, the sentence neither adds to nor detracts from the scope of the exemption as set forth in the remaining sentence of section 6 of the Clayton Act and, in this sense, it has no independent legal significance.

█ In view of the similarity in text and purpose between the federal and Colorado antitrust statutes, we decline to depart from the basic analytical framework developed by federal courts with respect to the labor exemption in antitrust prosecutions. Considering the expressed public policy of this state that "[n]egotiations of terms and conditions of work should result from voluntary agreement between employer and employee," section 8–3–102(1)(c), C.R.S.1973 (1981 Supp.), as well as the statutory right of employees to form labor organizations and "to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection," section 8–3–106, C.R.S.1973, we construe the Colorado labor exemption in section 6–4–103 to apply to those concerted employee activities arising out of an employment relationship and directed to the improvement of wages, hours of work and other conditions of employment. In our view the dispositive consideration is whether the defendants' agreement arises from lawful associational activity of employees concerning the terms or conditions of their employment. *See Los Angeles Local 626 v. United States, supra; Gulf Coast Shrimpers and Oystermans*

*Assn. v. United States,* 236 F.2d 658 (5th Cir. 1956), *cert. denied,* 352 U.S. 927, 77 S.Ct. 225, 1 L.Ed.2d 162 (1957); *Local 36 of International Fishermen & Allied Workers v. United States,* 177 F.2d 320 (9th Cir. 1949), *cert. denied,* 339 U.S. 947, 70 S.Ct. 801, 94 L.Ed. 1361 (1950).

█ In this case the evidence shows that the carpet installers operate their respective businesses as self-employed entrepreneurs. Admittedly, the physical effort required for carpet installation is the same whether performed by an independent contractor or an employee. However, an employee works under the direction or control of his employer for a wage or salary usually paid on a unit-of-time basis. The independent businessman, in contrast, works for himself and looks to prospective profits for his remuneration. Clearly, the object of the price-fixing agreement in this case was not to establish an employment relationship on behalf of the carpet installers or to settle the terms and conditions of such a relationship. The carpet installers stood in no employment relationship with each other, with the carpet retailer, or with the ultimate consumers of their services. So far as the record shows, the primary purpose of the agreement was to control the price at which carpet installation services would be sold, thereby imposing on the Grand Junction market a direct and immediate price restraint which carpet retailers and consumers could not realistically escape. To construe the labor exemption as suggested by the defendants would result in its extension to practically any form of human labor involving work for pay, independently of any employer-employee relationship. Such a construction inevitably would lead to the abrogation of the antitrust proscription itself. This we decline to do.[9]

The judgment is reversed and the cause is remanded to the district court with di-

---

9. Even if businessmen organize themselves into a union, they cannot on that account immunize themselves from antitrust prosecution. As the Supreme Court observed in *Los Angeles Local*

*626 v. United States,* 371 U.S. 94, 101–102, 83 S.Ct. 162, 166, 9 L.Ed.2d 150, 155–56 (1962):
　　"The narrow question which emerges in this case, therefore, is whether businessmen who combine in an association which would

rections to reinstate the indictment and to proceed as provided by law.

otherwise be properly subject to dissolution under the antitrust laws can immunize themselves from that sanction by the simple expedient of calling themselves 'Local 626–B' of a labor union. We think there is nothing in the Norris-LaGuardia Act nor in the Clayton Act, nor in the federal policy which these statutes reflect, to prevent a court from dissolving the ties which bound these businessmen together, and which bound them to the appellant union, in the circumstances of the present case."

\* \* \* \* \* \*

"[A]s the District Court correctly found, the present case was not one 'involving or growing out of any labor dispute,' but one involving an illegal combination between businessmen and a union to restrain commerce. In such a case . . . neither the Norris-LaGuardia Act nor the labor exemption provisions of the Clayton Act are applicable."

Moreover, while a collective bargaining agreement between a union and an employer, standing alone, is insufficient to form an illegal combination, the labor exemption may be lost when the agreement is part of a larger employer conspiracy involving monopolization and price-fixing, *see Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), or when the union agrees with an employer to impose the same wage scale on other employers outside the bargaining unit, *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).