**SALES AND ADVERTISING PROMO-TION, INC., an Oklahoma corporation, Plaintiff,**

v.

**DONREY, INC., a Nevada corporation, Defendant.**

**No. 84–C–152–B.**

United States District Court,
N.D. Oklahoma.

Oct. 31, 1984.

Joel Wohlgemuth, Terry M. Thomas, Norman, Wohlgemuth & Thompson, Tulsa, Okl., for plaintiff.

Floyd L. Walker, James F. Bullock, Tulsa, Okl., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRETT, District Judge.

This action was tried before the Court sitting without a jury on the dates of September 4, 5, 6, 7, 12 and 13, 1984. This action seeks monetary and injunctive relief for an alleged violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Having reviewed the evidence, the arguments of counsel and the applicable legal authority, the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff, Sales and Advertising Promotion, Inc. ("S & A"), is an Oklahoma corporation with its principal place of business in Okmulgee, Oklahoma. Defendant, Donrey, Inc. ("Donrey"), is a Nevada corporation which transacts business in the Northern District of Oklahoma.

2. Plaintiff is a privately held corporation engaged in the business of publishing the Exposure News Shopper (the "Exposure"), a bi-weekly newspaper. Plaintiff's stockholders are Michael Sills, and his wife, Sandra. The Sills operate plaintiff's business from a building the corporation recently acquired at 816 East 5th Street, Okmulgee, Oklahoma. Plaintiff also maintained an office in Glenpool, Oklahoma until the week of August 6, 1984, when the office was closed.

3. The Exposure is a free-circulated publication with its principal source of income being the sale of display advertising space. The open rate advertised by plaintiff for display advertising in the Exposure is $3.00 per column inch. National and local advertisers utilize the Exposure's advertising service. The publication is mailed free to all households within certain specified zip codes within the Okmulgee, Oklahoma area, including, without limitation, the municipalities of Mounds, Kiefer, Glenpool and Beggs and their surrounding areas. Circulation for the newspaper averages 10,700 households presently. The Exposure was formerly a once-weekly Wednesday edition newspaper. The Exposure began a Saturday edition in September 1983.

4. Donrey is a corporation engaged in all aspects of the print and broadcast media fields. Donrey operates fifty (50) newspapers nationwide, thirteen (13) of which are in Oklahoma. The Okmulgee Daily Times (the "Times") is published by Donrey in Okmulgee, Oklahoma and has been for forty (40) years. The Times publishes a supplement to its Wednesday daily newspaper known as the "Mainstream Edition." Paid circulation of the Times is approximately 5,700 and circulation of the Mainstream Edition is approximately 14,000.

5. In February 1977 the plaintiff published the first issue of the Exposure News Shopper. From February 1977 to October 1983 when the Saturday edition was added, the Exposure was a weekly free distribution newspaper. The major percentage of the Exposure was display advertising and the balance consisted of national, state and local news. Publications like the Exposure are referred to as "shoppers." With the more recent advent of computerized type setting and composing systems, and high speed presses, shoppers have become more prevalent in journalism advertising. The appeal of the shopper to the advertiser is its instant market penetration by mass dis-

tribution rather than to paid subscribers only. The parties herein are engaged in interstate commerce and the events involved herein occurred in part in the Northern District of Oklahoma.

6. Circulation revenue for the Times, as distinguished from advertising revenue, is approximately 15% of its total revenue. This percentage is consistent with paid circulation newspapers generally.

7. The daily newspaper industry, and other types of advertising media, are dependent upon advertising revenues for their economic viability. The advertising revenue, in turn, is directly related to the number of households reached.

8. Most paid circulation newspapers, including the Okmulgee Daily Times, have seen their paid circulation and "penetration" within their distribution area steadily decrease since about 1950. The loss has been due in major part to the changing habits of its former readers to depend more on television or radio and less on newspapers to satisfy their need for news and other leisure time attention. The result has been a steady decrease in the percentage of available advertising dollars received by newspapers and an increase in the percentage of available advertising dollars received by other media.

9. As revealed by a nationwide survey conducted in 1983, 75% of the daily newspapers in the United States have their own free distribution papers to compete with shoppers and provide market saturation, which is known as total market coverage ("TMC").

10. Beginning in 1979 and through 1983, the Times on alternating Fridays published a separate section called "The Friday Mainstream." That section contained advertising principally as well as business news and historical items.

11. In May 1982, the Times began a practice that it would print additional copies of its regular edition on every other Wednesday so that 4,500 copies could be delivered free to households in Okmulgee. On the alternating Wednesday the Times would print approximately 1,500 extra copies which would also be delivered to nonsubscribers in Okmulgee.

12. In September, 1983, plaintiff added a Saturday edition and on April 4, 1984, plaintiff added a second free Wednesday distribution publication which it called the Tri-City News. The Tri-City is distributed each Wednesday in an area north of and adjacent to Okmulgee County, and encompasses parts of Creek County and Tulsa County. Previously the Wednesday Exposure had been distributed in the same area. The front section of the Tri-City is not identical to the Wednesday Exposure, however the remainder of the Tri-City, except for a single issue, has been identical to the Wednesday Exposure.

13. During the first half of 1982 the Times was aware of stiff competition from the Exposure and some loss of business. In early June 1983 Donrey employees Ralph Smith ("Smith"), regional manager, and David Renfro ("Renfro"), the Times manager, met in Okmulgee and discussed the Exposure, its management, and current circulation. Renfro made specific investigation of the background and financial condition of the plaintiff's president Mike Sills as well as Jimmie Stephenson, a vice-president of the plaintiff and formerly general manager of the Times. Renfro also checked into and made investigation of the financial condition of the plaintiff. The purpose of the Renfro investigation was to gather facts concerning the financial stability and strength of the plaintiff. Renfro and Smith discussed the possibility of establishing a new second class or third class mailing publication in Okmulgee. The third class publication would be used as a "nonsubscription product" with a coverage target including Okmulgee and those smaller towns "in the opposition area (Beggs, Mounds, Keifer-Glenpool-Preston-Beeline)." The third class publication was to be utilized as a "major marketing piece" to more effectively compete with the Exposure. (Plff. Ex. No. 5–19).

14. On June 8, 1983 Renfro mailed to Smith some "clippings of the front page

article from my competition in Okmulgee." Renfro further stated that "It looks as if the battle lines have been drawn." (Plff. Ex. No. 5–28).

15. On June 13, 1983, Smith prepared a memorandum to Pendergraft, vice-president of the eastern newspaper division of Donrey, and a member of Donrey's Board of Directors, regarding the "Okmulgee situation." Smith noted the "week" [sic] financing of "our [o]pposition," referring to the plaintiff. Smith then detailed the results of his investigation of the plaintiff's financial condition and problems. Smith further stated that: "Sills, incidentally, is capable and knows how to sell. I am still working on his background, etc. and will keep you informed of what I find out." (Plff. Ex. No. 5–30).

16. Smith prepared a second memorandum to Pendergraft on June 13, 1984 entitled, "Okmulgee Oppositional Plan." (Plff. Ex. 5–31) Smith outlines various proposals therein as a plan to "combat" the Exposure and notes that the plan could cost up to $50,000 to implement in the next fiscal year. Smith proceeds on the premise the plaintiff desires to convert to a newspaper and because of the plaintiff's inadequate financing the proposed plan could cripple the plaintiff's expansion. The previous manager of the Times had just gone to work for the plaintiff Exposure. It is interesting to note one of the plan recommendations of Smith to Pendergraft to promote the suggested publications is to "buy billboards, KVOO radio (Tulsa based) and house ad campaign." In closing, Smith states:

"The above plan is practical, not too expensive and accomplishes some goals we need to in the market anyway and puts enormous pressure on all competitors in the market. The cost is reasonable under the circumstances and does provide possibilities for at least a break-even in cost recovery during development and an opportunity to produce good revenue in the future.

I have discussed this plan with Renfro, but not with the understanding that we would use it. I told him I would discuss it with you because of the potential costs involved.

I feel the plan, depending on how much of it you want to implement could cost extra, $91,000 per year less $40,000 in new revenue with a net cost of about $50,000 for the new fiscal year.

I feel if we can do this for a year or less, we could cripple Stephenson's plan for operation and kill his expansion plan unless he gets significant financing.

I also would like to visit with you either in Okmulgee, at your office or somewhere with Renfro before we implement whatever plan that is decided upon." (Plff. Ex. 5–31)

Pendergraft rejected the Smith "Okmulgee Oppositional Plan" in part because of its excessive costs.

17. Previously, on October 18, 1982 in a report from Smith to Pendergraft about the Okmulgee Daily Times (Plff. Ex. 6–3), Smith stated: "We hope to continue pressure on his competition in the same manner as Macon (referring to Donrey's Macon, Missouri newspaper competing with a similar shopper). If we can get him thin enough, he will probably fold in March." (This referred to Smith's view that the plaintiff would overextend and ultimately go out of business).

18. During 1983 and 1984 Donrey conducted an investigation of the plaintiff's cost of publishing and printing the Exposure. On June 22, 1983 Donrey prepared a document entitled "Estimated Revenues—Exposure June 22, 1983." (Plff. Ex. 5–35). Therein the Exposure's advertising accounts are listed along with information concerning column "inches" and "revenues."

19. On June 24, 1983 a meeting was held at the business office of the Times in Okmulgee. Present at that meeting were Smith, Renfro and Pendergraft. The purpose of the meeting was to discuss the competitive situation in the Okmulgee market. At the conclusion of that meeting it was decided to have a market study conducted by "ONAB." It was also decided to

publish a free-circulation shopper with a total distribution of 20,000 to be mailed on Tuesday and delivered by carrier on Wednesday, commencing mid-July 1983. The shopper, as envisioned by those present at the June 24 meeting, was never published. (Plff. Ex. 5–14).

20. On July 7, 1983 Renfro, in a memorandum to Pendergraft, enclosed a copy of that week's Exposure and stated that he was still "putting together the pieces for our Market Package." (Plff. Ex. 5–38). On July 16, 1983 Smith reported to Pendergraft that Renfro was proceeding on his new product the "Marketplace Plus" which should be on the market by July 27 or August 3, 1983. (Plff. Ex. 5–40). On July 27, 1983, Renfro mailed Pendergraft the weekly copy of the Exposure and stated that the "Total Market Program" was progressing slowly but positively and should be instituted within the month. (Plff. Ex. 5–42).

21. On November 15, 1983, Renfro, in a report to Smith, stated that the Exposure was then a twice weekly publication with carrier delivery in Okmulgee, Morris and Beggs. The Exposure began its Saturday edition on September 1, 1983. He noted that the Exposure had opened a Henryetta office, and further stated that: "I feel his expansion efforts are costly and if I would be able to attract one or two of his major advertisers it would hurt his already unsure financial base." On November 30, 1983, Renfro stated to Smith: "With the Exposure (the local shopper) now publishing Wednesday and Saturday I feel that an effort needs to be taken to try and retain as well as regain some of the business that they have. Looking forward to the promotion we talked about (written proposal to follow) to possibly lure some of his business our way." (Plff. Ex. 6–7).

22. On December 5, 1983, in a report to Pendergraft, Smith stated that Donrey needed to "get into his [referring to plaintiff] breadbasket in the north county area—which we will do shortly." (Plff. Ex. 6–9).

23. On January 5, 1984, Smith reported to Pendergraft that Renfro would "get our new Promo-marketing package in the market Jan. 11." (Plff. Ex. No. 201).

24. On January 11, 1984, the distribution scheme presently used was implemented which is that each Wednesday the Times publishes a Mainstream section (in addition to the regular Wednesday edition), which goes to all subscribers and approximately 4,000 nonsubscribers free of charge. The purpose of distributing to nonsubscribers is to increase the number of households reached.

25. Defendant's present plan required no new capital expenditure and no increase in staff but some increase in cost. For the most part, it utilized excess capacity that otherwise existed. The response of defendant in developing its own TMC (free nonsubscriber shopper type publication) was a normal competitive response to plaintiff's TMC shopper publication.

26. The effect of the January 11, 1984 change was to shift the "Friday Mainstream" (every other Friday) to each Wednesday, accompanied by a name change to the "Mainstream Edition" and to increase the total amount of nonsubscriber distribution.

27. Concurrently with implementing the "Mainstream Edition," the Daily Times discontinued giving away extra copies of its regular Wednesday paper. The free distribution has been limited to only the "Mainstream Edition" portion of the Wednesday Daily Times. (D. Renfro).

28. A "pick-up" rate, for the Mainstream Edition only, is offered to advertisers who purchase an ad in the Daily Times at the advertiser's standard earned rate during the preceding six (6) days. That is, an initial ad published on Thursday through Tuesday may be "picked-up" and republished in the next Wednesday Mainstream, only, at a rate of $1.00 per column inch for the pick-up ad.

29. In addition to the lower pickup rate, lower rates were also adopted for reprinted or insert ad distribution in the Mainstream,

from $60.42 per 1,000 insert (for eight page tabloids) to $44.00 per 1,000 for the Mainstream Edition only. Such advertising materials are referred to in the newspaper industry as "pre-prints" or "inserts", which are folded and inserted into the main publication.

30. Initially the Mainstream Edition was mailed under a second class permit with U.S. postal approval. In May 1984, the United States Postal Service notified the Daily Times that the Mainstream did not qualify for second class mail privileges. Since May, the Mainstream Edition has been mailed as third class material. Mailing costs have been lower under the third class rate than under the second class rate formerly used.

31. The $1.00 pick-up rate was established in part by reference to rates offered by other Donrey publications such as the Guthrie Daily Leader and the Benton County Daily Democrat. Renfro stated he had conducted an informal study of Donrey's costs of production prior to the implementation of the $1.00 pickup rate. He did not recall the result of that study, nor did he produce any writings or other documentation reflecting Donrey's findings.

32. Previous to January 11, 1984 there was no distribution by the Times of the Mainstream to nonsubscribers. After January 11, 1984, the Times distributed up to approximately 8,000 copies of the Mainstream to nonsubscribers.

33. In the months of February through June of 1984 Smith reported to Pendergraft regarding the results of the pricing and marketing changes instituted by Donrey on January 11:

(a) "The biggest news we have with this operation is after six months of meticulous planning, we have gotten a TMC (Total Market Coverage) product on the market. The TMC is a solid product and should do very well against our competitor. The second stage of distribution is planned in late February." Plff. Ex. 206, dated February 23, 1984).

(b) "David is still fighting his competitor and while costs have increased, our competition has slowed its growth. I feel this property will do better in March and so does David." (Plff. Ex. No. 6–13, dated March 14, 1984).

(c) "David is doing much better. Expenses are still too high but he is now whipping his opposition which is beginning to slip in linage [sic]. David is continuing to work directly with Kleier on the lawsuit." (Plff. Ex. No. 202, dated March 30, 1984).

(d) "The Okmulgee market is improving some and the increase this month can be attributed to our marketing change with our marketplace shopper to accommodate our market problems. Continuation of this effort will improve our position in the competition." (Plff. Ex. No. 203, dated April 13, 1984).

(e) "This is the 2d month for local to be up. Of course expenses continued to be too high. The TMC product is working fairly well in the market. The opposition continues to do fairly well, but is not getting gains. Their operation has apparently leveled off." (Plff. Ex. No. 204, dated May 16, 1984).

(f) "Our opposition appears to be losing a little ground. Our tactics in this market are working consistently." (Plff. Ex. No. 205, dated June 1, 1984).

34. At the directors' meeting for Donrey on August 7–8, 1982 at Incline Village, Nevada, Pendergraft reported that: "Jimmie Stephenson busted the million dollar revenue mark for the first time in the history of the Daily Times. He grossed $1,014,936 which was 104% of budget and 108% of last year. Net after tax was $125,040 for 109% of projections and 145% of last year. That's not a bad year for Okmulgee." (Plff. Ex. No. 100, p. 14).

At the directors' meeting of October 25–26, 1982 in Fort Smith, Arkansas, Pendergraft reported that the Times produced revenue of $262,819 for 101% of budget and 110% of previous year [referencing the

last quarter operations]. (Plff. Ex. No. 101, p. 13).

At the January 22–23, 1983 directors meeting in Kailua-Kona, Hawaii Pendergraft reported: "Revenue at the Times was $293,133 which represents 100% of budget and 108% of last year. Net after tax was $54,890, representing 115% of budget and 142% of last year." (Plff. Ex. No. 102, p. 18).

At the directors meeting in Okmulgee on May 1–3, 1983, Pendergraft reported: "Revenue at the Times was $256,827 for 97% of budget and 106% of last year. Net after tax was $35,513 for 95% of budget and 121% of last year." (Plff. Ex. No. 103, p. 18).

However, at the directors' meeting at Glasgow, Kentucky on October 31–November 1, 1983, Pendergraft reported that the Okmulgee Times showed up "on the problem list." (Plff. Ex. No. 105, p. 15).

In the Eastern Division Operational Problem Properties Report, which was also given at the Glasgow directors' meeting, it was noted that the Times' revenue was under budget by $19,800 or 7%. (Plff. Ex. No. 104, p. 6).

At the directors' meeting in Kailua-Kona, Hawaii on January 29–30, 1984 it is noted that the Okmulgee Times is " * * * on Renfro's problem properties list." (Plff. Ex. No. 106, p. 17).

35. On February 13, 1984, plaintiff's counsel wrote a letter to Donrey stating that the January 11 pricing and marketing changes were violative of the federal antitrust laws. Donrey was asked to discontinue those policies. (Plff. Ex. A). By letter of February 22, 1984, Donrey, through its general counsel, denied plaintiff's allegations and declined to discontinue the practices in question. (Plff. Ex. B) This action was thereafter filed by plaintiff on February 22, 1984 seeking injunctive relief and damages under the antitrust laws. (Plff. Ex. C).

36. Advertising media employed by local and national advertisers takes many forms. To list but a few: newspapers and periodicals of all kinds, television, radio, billboards, direct mail, handouts, specialty or novelty items such as match covers, calendars, calling cards, key chains, emery boards, lapel pens, signs, containers, etc. Each of these types of advertising can be found in the area of Okmulgee County, Oklahoma.

37. To establish a § 2 violation, plaintiff must, as a threshold issue, establish the relevant product and geographical market in which such violation is claimed to have occurred. Plaintiff's contention is that the relevant market in which defendant's violations occurred is newspaper display advertising for local and national advertisers published in Okmulgee County; and that market share should be measured by comparing defendant's revenues to the total revenues of plaintiff and defendant. Defendant's position is that the relevant product market urged by plaintiff does not include reasonably interchangeable and substitutable alternative advertising media available to advertisers and thus does not constitute a relevant product market for Sherman Act § 2 purposes.

38. On a national scale the evidence established in 1983 advertisers spent approximately $75,000,000,000 to have advertising messages delivered to households or people throughout the United States. Such advertising dollars were expended for national or local advertising in various types of media or advertising mediums; newspapers received about 27%, television 21%, radio 7%, direct mail 16%, magazines 5%, and all others 24%. "All others" includes billboards, advertising specialties, and various other types of advertising medium.

39. National advertising is not restricted to a particular locality or region and is generally considered to have as its goal the creation of "name recognition" or "image enhancement." Examples of national advertisers are cigarette manufacturers, breweries, auto manufacturers, national fast foods, etc. Local advertising is basically to increase the traffic in the advertiser's place of business. Local advertising

can be purely local or regional such as a multi-county area.

40. A relevant product (advertising) submarket may exist where there is real competition in the form of interchangeability or substitutability among selected advertising medium. (For example: it is improbable that regional television emanating from Tulsa covering most of eastern Oklahoma is interchangeable or substitutable with local newspaper display advertising in the general area of Okmulgee County. This is because the advertiser will pay an inflated rate to reach thousands of households outside its market area. On the other hand, local radio, local billboards, or zoned direct mail advertising is reasonably interchangeable or substitutable for local newspaper display advertising and may therefore be part of the relevant product submarket. Advertisers such as Walmart or Gibson discount stores may employ various advertising media locally and/or regionally.)

41. Economic realities define the relevant geographic market and such relevant geographical market is not necessarily dictated by the decision of a competitor to restrict its efforts to a given area. In defining the relevant geographic market, one must give due regard to the competitive reach of each and every competitor who is actually vying for the advertising dollar and who will offer the advertiser reasonable economic alternative and thereby cross elasticity in the geographic area in which the advertising is disseminated.

42. On the facts and evidence in this case, the Court finds that the geographic relevant market is, at a minimum, the area of distribution of the plaintiff's two publications, the Exposure and the Tri-City News, which is Okmulgee County, southwest Tulsa County, and part of eastern Creek County, Oklahoma.

43. The evidence has not established the relevant product market is limited to newspaper display advertising computed in column inches in the parties' publications. The Court is not prepared to conclude the relevant product market herein is "all" advertising media as contended by defendant. From the evidence presented the more probable relevant product market is an ill-defined submarket consisting of local newspaper display advertising, local radio, billboards, zoned direct mail, etc. These specified media in the geographic area are reasonably interchangeable and cross-elastic with local newspaper display advertising. Therefore, the plaintiff has not sustained its burden of proof in establishing the relevant product market or submarket.[1]

44. The evidence did not provide any basis for a determination of the defendant's market share. While the evidence has established comments and discussions by representatives of the defendant which appear predatory toward plaintiff, the failure of the plaintiff to establish the relevant product market renders these words or purported intentions not material.

45. The evidence has not established that during the period of time involved the defendant had monopoly power in the relevant product market nor has it been guilty of an attempt to maintain or acquire a monopoly; nor has the evidence demonstrated a dangerous probability of success in achieving monopoly power.

46. Due to the fact the plaintiff has not established the relevant product market, nor that defendant has monopoly power or has attempted to maintain monopoly power or a probability of achieving monopoly power, the Court need not pass on the predatory pricing issue. However, the Court makes the following observations concerning the defendant's $1.00 pickup advertising rate:

(A) In order to qualify for the $1.00 pickup rate, defendant's customers must have first purchased the same ad earlier at the customer's earned rate

---

1. Defendant possessed 68% or greater of the local newspaper display advertising computed on a column inch basis. This fact, however, is relevant only if newspaper display advertising is accepted as the relevant product market.

($2.88) during the preceding six days. Thereby the customer must have purchased a minimum of two ads for a total cost of $3.88. The lowest effective economic rate is $1.94 per column inch for each ad.

(B) The cost of publishing a pickup ad is in the truest sense of the word "incremental." The pickup ad represents the last increment of previously published matter, the cost of republishing such an ad (together with its pro rata share of news and editorial material, is the actual increment of additional cost incurred). "Incremental" cost is the functional equivalent of "marginal cost" for these purposes. The only distinction is that incremental cost is the cost over an increment of production, while marginal cost refers to a single additional unit of production.

(C) The cost of publishing such pickup advertising does not exceed the revenue received for it.

47. The evidence did not establish any actionable or compensable damage as a result of the alleged conduct of the defendant.

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction under the provisions of 15 U.S.C. §§ 2, 4, 15, 22 and 26; 28 U.S.C. § 1337. Venue is proper pursuant to § 12 of the Clayton Act, 15 U.S.C. § 22.

2. Monopolization under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power by unlawful means as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *United States v. Grinnell Corporation*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

3. The offense of "attempt to monopolize" is the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short of the intended goal, nevertheless approach so close as to create a dangerous probability of success. *Walker Process Equipment v. Food Machinery*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *American Tobacco v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Agrashell, Inc. v. Hammons Products*, 479 F.2d 269 (8th Cir. 1973); *Times-Picayune v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

4. A "relevant product market" is comprised of all of those products which the customer or user considers to be reasonably interchangeable. *United States v. duPont*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); and *Advance Business Systems and Supply Company v. S.C.M. Corp.*, 287 F.Supp. 143 (M.D.1968).

5. All products reasonably interchangeable must be included in the same relevant market. *Telex Corp. v. IBM Corp.*, 510 F.2d 894 (10th Cir.1975).

6. This Court is not free to accept the market suggested by plaintiff but must examine commercial realities affecting all competition in the industry. *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1016 (9th Cir.1983); and *Hayden Publishing Company, Inc. v. Cox Broadcasting Corporation*, 566 F.Supp. 503, 506 (E.D.N.Y.1983).

7. The burden of proving the relevant market is upon the plaintiff. *Hayden Publishing Company, Inc. v. Cox Broadcasting Corporation, supra; Acme Precision Products, Inc. v. American Alloys Corporation*, 484 F.2d 1237 (8th Cir.1973); *Gough v. Rossmor Corp.*, 585 F.2d 381, 385 (9th Cir.1978); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177–178, 86 S.Ct. 347, 350–351, 15 L.Ed.2d 247 (1965), and *United States v. duPont*, 351 U.S. 377, 381, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956).

8. Within a broad product market, well defined submarkets may exist

which constitute product markets for purposes of a Section 2 case. The boundaries of a submarket is to be "determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Company v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

9. Upon the basis of the findings herein set out, and the applicable case law, the Court concludes the plaintiff has not established by a preponderance of the evidence the relevant product market or submarket. Further, the Court concludes that the relevant submarket limited to newsprint display advertising computed on a column inch basis, as urged by plaintiff, is an inappropriate definition of the relevant product market under § 2 of the Sherman Act.

10. Monopoly power is the power to control prices or to unreasonably restrict competition. The existence of monopoly power may be inferred from a predominant share of the relevant product market. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *American Tobacco Company v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

11. It is not the possession of monopoly power, but rather the use of that power which is unlawful. *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 926–927 (10th Cir.1975).

12. Upon the Court's findings that defendant does not have monopoly power within a proven relevant product market, and that it has not been shown defendant has a "predominant share" of a relevant product market, the Court concludes that defendant does not have, nor has it attempted to unlawfully acquire monopoly power or is there probability of defendant achieving monopoly power.

13. The comment and discussions by representatives of the defendant which were predatory in nature toward the plaintiff do not in and of themselves establish a Sherman § 2 claim because plaintiff as a predicate must establish the relevant product market or submarket and monopolist conduct or attempted monopolist conduct on the part of the defendant. *Pacific Engineering v. Kerr McGee*, 551 F.2d 790 (10th Cir.1977); *Telex v. IBM*, 510 F.2d 894 (10th Cir.1975) and *Hayes v. Solomon*, 597 F.2d 958, 977 (5th Cir.1979).

14. To establish predatory pricing, it is not enough for plaintiff to show that defendant's rate for a particular ad appearing in the Mainstream was below the cost of publishing that particular ad. What is required is a showing that defendant's rates are below its marginal or incremental cost for publishing pick-up advertising. *Pacific Engineering v. Kerr McGee, supra;* and *Telex v. IBM, supra.*

15. Marginal or incremental cost is the cost at any production level of producing an extra unit or increment of the product. In this instance, incremental cost is the economic equivalent of marginal cost. An immaterial distinction is that "marginal" cost refers to one additional unit of production, while the "incremental" cost used by defendant's witness refers to the entire increment—that is, Mainstream pick-up advertising and the associated news and editorial copy. The Court concludes that defendant has not priced Mainstream pick-up advertising below its incremental cost. *Pacific Engineering v. Kerr McGee, supra;* and *Telex v. IBM, supra.*

16. In order to demonstrate that it is entitled to an award of damages, plaintiff must not only establish that the defendant has been guilty of antitrust violations, but that plaintiff has, in fact, been injured or damaged as a result of such violations. *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The burden is upon the plaintiff to prove the fact as well as the amount of its damages. *Story Parchment Company v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). The

**550**

plaintiff's evidence has failed in this regard.

17. The Court concludes that under the evidence presented and applicable law there has been no violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

18. A Judgment in keeping with the Findings and Conclusions herein should be entered this date.