**SMALLEY & COMPANY, Plaintiff,**

v.

**EMERSON & CUMING, INC., Defendant.**

**Civ. A. No. 90 N 745.**

United States District Court, D. Colorado.

Sept. 30, 1992.

Daniel R. Satriana, Jr. and Sean R. Gallagher of Hall & Evans, Denver, Colo., for plaintiff.

Larry L. Theis and Bobbee J. Musgrave from Walters & Theis, Denver, Colo., for defendant.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

Plaintiff Smalley & Company is a distributor of adhesives and sealants. Defendant Emerson & Cuming manufactures adhesives and sealants. Defendant distributes its products both directly and through distributors. In November 1987, plaintiff entered into a distributor agreement to sell defendant's products. In January 1989 and again in September 1989, Thiokol Corporation, an aerospace company, issued a request for quotation to supply a certain adhesive manufactured by defendant. Thiokol awarded the two contracts to plaintiff. In March 1990, defendant notified plaintiff that the distributor agreement would be terminated effective April 1990. That same month, plaintiff filed this complaint alleging that defendant terminated the distributorship in retaliation for plaintiff's refusal to participate in a bid-rigging scheme to supply defendant's products to Thiokol. Plaintiff asserts antitrust claims for price fixing, allocation of the market, monopolization, conspiracy to monopolize, and attempt to monopolize in violation of the Sherman Anti–Trust Act, 15 U.S.C.A. §§ 1, 2 (West 1988). Plaintiff's Amended Complaint also includes several other claims for relief: breach of contract, promissory estoppel, tortious interference with prospective contract, and violation of the Colorado Restraint of Trade and Commerce Act, Colo.Rev.Stat. §§ 6–4–101 to 108 (1973 & Supp.1991). Jurisdiction is based on both federal question and diversity. 28 U.S.C.A. §§ 1332, 1337 (West Supp.1992).

This matter is now before the court on defendant's motion for summary judgment on all claims. The primary issues are: (1) whether plaintiff has established that defendant's conduct constitutes a *per se* violation of section 1; (2) whether a single trademarked product sold to one customer can constitute a relevant product market; (3) whether plaintiff's evidence is sufficient to prove that defendant breached any agreement with plaintiff; (4) whether plaintiff's evidence concerning detrimental reliance is sufficient to withstand summary judgment; and (5) whether plaintiff's Colorado antitrust claims must fail because plaintiff's federal claims cannot withstand summary judgment. I conclude that plaintiff has failed to establish a *per se* violation of section 1. I also conclude that a single trademarked product sold to one customer cannot constitute a relevant product market. Because I find that a proper definition of the relevant market is an element of each of plaintiff's antitrust claims, I grant defendant's motion to dismiss plaintiff's antitrust claims. In addition, plaintiff fails to prove that defendant's termination of the distributorship relationship constituted a breach of any contract, express or implied, between E & C and Smalley. Similarly, plaintiff does not demonstrate the detrimental reliance necessary to establish its promissory estoppel claim. I therefore grant defendant's motion for summary judgment on both the breach of contract and promissory estoppel claims. Finally, due to the substantial similarity between the state and federal antitrust statutes, I grant defendant's motion for summary judgment on the state antitrust claim under the same rationale as the federal antitrust claims.

## FACTS

Plaintiff is a wholesale distributor of sealants, adhesives, and coatings used in construction and manufacturing. Defen-

dant manufactures and sells industrial adhesives and sealants. Defendant sells its products both directly to customers and through a distributor network, a marketing system referred to as "dual distribution." On November 1, 1987, the parties entered into a distributor agreement, whereby plaintiff would be a distributor for defendant in Colorado, Arizona, New Mexico, and Utah. The distributorship agreement provided in part that plaintiff would "use its best efforts to promote, maintain and increase the sale of E & C products in the primary geographic area as well as to promote the goodwill of E & C; ... [and] concentrate its efforts on sales of E & C Products in the primary geographic area to small and medium sized accounts." *Memorandum Brief in Support of Defendant's Motion for Summary Judgment,* ex. 9 ¶ 3(a) (filed July 9, 1991) [hereinafter called *Defendant's Brief*]. The agreement stated that it "shall expire one (1) year from the date thereof ... unless sooner terminated as provided in Paragraph 10 hereof, without liability to the other party (except for amount owing one to the other). It may thereafter be renegotiated for successive periods representatives [sic] of each party hereto." *Id.* at ¶ 11. Because the agreement did not contain a paragraph 10 or any other paragraph concerning termination, the reference to paragraph 10 appears to be an error.

One of the numerous adhesives manufactured and sold by defendant is Eccobond 56C, for which defendant owns a federally-registered trademark. Eccobond 56C is a low-resistance electrically conductive adhesive. It is sold to numerous high technology and aerospace customers, including Ford Aerospace, Martin Marietta Corporation, and Thiokol Corporation. Thiokol manufactures solid rocket motor systems for use in missiles and space vehicles, including the space shuttle. When requesting products, Thiokol typically requires that the product comply with the standards set forth in a Procurement Data List (PDL). PDL No. 7566 sets forth the standards for electrically conductive adhesives. *See Plaintiff's Response to Defendant's Motion for Summary Judgment,* ex. 39

(filed Aug. 8, 1992) [hereinafter called *Plaintiff's Response*]. At the time of these events, Eccobond 56C was the only product which complied with the requirements of the PDL No. 7566.

E.V. Roberts ("Roberts") is another company which distributes defendant's products. Defendant, plaintiff, and Roberts have all bid against one another for contracts to supply Eccobond 56C to Thiokol. All three have, at one time or another, contracted with Thiokol to supply Eccobond 56C. From 1987 to early 1988, Roberts raised its bid price in its bids to Thiokol. After 1988, Roberts did not win any contracts with Thiokol. On January 25, 1989, Thiokol issued a request for a firm fixed-price quotation for a low resistance electrically conductive adhesive which complied with the standards set forth in PDL No. 7566. Thiokol received bids from plaintiff, defendant, and Roberts. Thiokol awarded the contract to plaintiff. Plaintiff alleges that defendant's Sales Manager, Mr. Mike Dilworth, told plaintiff that it had no business submitting bids to Thiokol to supply Eccobond 56C.

On September 28, 1989, Thiokol issued another request for quotation for an adhesive which complied with PDL No. 7566. Thiokol again received bids from plaintiff, defendant, and Roberts. Thiokol again awarded the contract to plaintiff. By letter dated December 7, 1989, defendant wrote plaintiff a letter stating that the distributorship agreement had expired and that new negotiations should be initiated. The letter stated that defendant's decision to sign a new contract would depend on an assessment of the sales during the first six months of 1990. *Plaintiff's Response,* ex. 4. By an agreement dated February 19, 1990, Thiokol and plaintiff entered into a fixed-price redeterminable contract totalling $365,337.50. Plaintiff began supplying, and has continued to supply, defendant's Eccobond 56C pursuant to its contract with Thiokol.

By letter dated March 16, 1990, defendant notified plaintiff that it would terminate the distributor agreement effective April 30, 1990. *Plaintiff's Response,* ex. 6.

Defendant has continued to supply products needed by plaintiff to fulfill contracts made prior to termination of the distributorship. On April 27, 1990, plaintiff filed this complaint alleging various antitrust and state law claims. Plaintiff alleges that defendant terminated the distributor agreement because plaintiff refused to participate in defendant's bid-fixing scheme, and that defendant abused its power by monopolizing, attempting to monopolize, or conspiring to monopolize sales of Eccobond 56C to Thiokol. Plaintiff asserts four separate antitrust claims: (1) a section 1 claim for price-fixing and allocation of customers, (2) a section 2 claim for monopolization, (3) a section 2 claim for conspiracy to monopolize, and (4) a third section 2 claim for attempt to monopolize. Plaintiff also asserts four state law claims: breach of contract, promissory estoppel, tortious interference with prospective contract, and violation of the Colorado Restraint of Trade and Commerce Act. Plaintiff seeks both damages and permanent injunctive relief.

## ANALYSIS

### Plaintiff's Antitrust Claims

■ Plaintiff alleges violation of both section 1 and section 2 of the Sherman Anti–Trust Act. 15 U.S.C.A. §§ 1, 2 (West 1973). Section one prohibits contracts and conspiracies that restrain trade. 15 U.S.C.A. § 1 (West 1973). This broad language is tempered by the "rule of reason" under which only unreasonable restraints on trade are treated as violations of section 1. *See Reazin v. Blue Cross and Blue Shield, Inc.*, 899 F.2d 951, 959 (10th Cir.), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). Section two prohibits monopolization. I will discuss each of plaintiff's antitrust claims, starting with the section 1 claim.

■ There are two separate types of section 1 violations. If the rule of reason applies, plaintiff must prove that defendant's actions resulted in an unreasonable restraint of trade. Alternatively, plaintiff may prove that defendant's conduct falls within one of several categories that are conclusively presumed to be illegal, *per se*

violations of section 1. *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1392 (10th Cir. 1992). If plaintiff proves that defendant's conduct falls within one of these categories, it is not necessary to prove that the conduct resulted in an unreasonable restraint on trade. Plaintiff here has alleged two *per se* violations of section 1: price fixing and horizontal allocation of the market. *See Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 343–48, 102 S.Ct. 2466, 2472–75, 73 L.Ed.2d 48 (1982) (both price fixing and horizontal market restrictions are *per se* violations of section 1).

■ When analyzing a motion for summary judgment on a section 1 claim, the Supreme Court has held that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). For section 1 claims the nonmovant must submit more than ambiguous evidence of the alleged conspiracy to withstand a motion for summary judgment. "Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* To survive a motion for summary judgment, "a plaintiff seeking damages for a violation of section 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 [1984]). Therefore, plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action" to avoid summary judgment. *Id. Accord Eastman Kodak Co. v. Image Technical Servs., Inc.*, — U.S. ——, ——, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) (nonmoving party's inferences must be reasonable in order to reach the jury). Under the standard for summary judgment of *Matsushita*, the court must examine the inferences that can be drawn from defendant's conduct. *Gibson v. Greater Park City Co.*, 818 F.2d

722, 724 (10th Cir.1987). The Tenth Circuit has restated *Matsushita* as a two-part evidentiary test: (1) is plaintiff's evidence of conspiracy ambiguous, i.e., is it as consistent with defendant's permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that defendant was pursuing these independent interests. *Id.*

### Price Fixing

■ Plaintiff alleges that defendant conspired with others to fix the price of Eccobond 56C. Plaintiff offers evidence that: (1) defendant wanted to keep large or "key" accounts for itself; (2) defendant's sales manager told plaintiff that "it did not have any business submitting bids to Thiokol"; (3) one of defendant's employees told plaintiff that defendant terminated plaintiff's distributorship because plaintiff submitted competitive bids on the Thiokol account; (4) Roberts, another distributor, submitted competing bids, but was never told to stop; (5) defendant permitted Roberts to submit competing bids because Roberts always bid higher than defendant on Thiokol bids; and (6) one of defendant's employees asked Roberts to submit a bid without a discounted payment provision on a different account. Plaintiff attributes a price-fixing motive to these actions.

Defendant, however, submitted additional evidence and offered plausible explanations for its actions that tend to disprove any price-fixing motive. Defendant itself regularly discounted its price of Eccobond 56C on bids to Thiokol, a policy defendant explains as an effort to overcome competition from its distributors. Roberts also sold Eccobond 56C at discounted prices to Thiokol. Defendant claims that it terminated the distributorship because plaintiff failed to grow properly, paid its accounts slowly, and violated its promise to concentrate on small and medium accounts. I find that plaintiff's evidence is an consistent with defendant's permissible independent interest as it is with an illegal conspiracy. Therefore, the evidence is ambiguous under the first prong of *Gibson. See, e.g., Valley Liquors, Inc. v. Renfield Import-*

*ers, Ltd.*, 822 F.2d 656, 662 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987) (no price fixing conspiracy when other distributors undercut each others' prices at various times; termination of distributorship in course of realignment was a sufficient independent interest).

When the evidence is ambiguous, the court must decide whether, under the second prong of *Gibson*, there is any evidence that tends to exclude the possibility that defendant was pursuing these independent interests. Since defendant offered evidence of legitimate business reasons for its conduct, plaintiff has the burden of providing evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Gibson*, 818 F.2d at 725; *see Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356.

Plaintiff identified only Roberts as a possible co-conspirator, relying on the testimony of Mark Neuber, a former employee of defendant, as direct evidence that defendant solicited Roberts to fix prices. *Plaintiff's Response*, ex. 28 at 45–46. However, Mr. Neuber's deposition does not reveal any price-fixing conspiracy; it only indicates that defendant wanted Roberts to quote certain terms of payment. Mr. Neuber never said that defendant asked Roberts to sell Eccobond 56C at a specific price or to maintain a certain price level. Nor has plaintiff offered evidence that Roberts acquiesced to such a price-fixing conspiracy. In fact, Mr. Neuber indicated that Roberts continued to quote discounted terms after defendant asked them to stop. *Id.* at 46. Plaintiff in this case admitted that defendant never told it to sell Eccobond 56C at a certain price. Plaintiff's evidence is simply insufficient to prove any contract or agreement on price. *See, e.g., Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 735, 108 S.Ct. 1515, 1525, 99 L.Ed.2d 808 (1988) (*per se* illegality in vertical price fixing cases requires an agreement on price or price level). Plaintiff has not offered sufficient evidence to substantiate its claim of a price-fixing conspiracy. The evidence does not tend to exclude the possibility that defendant was

legitimately competing with its distributors and pursuing legitimate business interests. I therefore grant summary judgment in defendant's favor on the claim of conspiracy to fix prices in violation of section 1.

*Horizontal Allocation of Market*

■ Plaintiff alleges that defendant entered into a contract or participated in a conspiracy with others to allocate customers in the market. "The essence of a market allocation violation ... is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers." *Mid–West Underground Storage, Inc. v. Porter,* 717 F.2d 493, 496–98 n. 2 (10th Cir.1983). Allocation of the market is characterized as either horizontal or vertical. A horizontal conspiracy occurs when competitors at the same market level agree to restrain trade on either their own or another market level. *See Business Elecs. Corp. v. Sharpe Elecs. Corp.,* 485 U.S. 717, 730, 108 S.Ct. 1515, 1523, 99 L.Ed.2d 808 (1988). Horizontal market restrictions are *per se* illegal. *Key Fin. Planning Corp. v. ITT Life Ins. Corp.,* 828 F.2d 635, 640 (10th Cir.1987). Vertical restrictions result when companies at different market levels in the chain of distribution of a specific product, as between a manufacturer and distributor, conspire to restrain trade. Vertical restraints are subject to the rule of reason. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977).

■ Plaintiff characterizes the allocation as horizontal because defendant sells directly to customers and acts as a distributor pursuant to a dual distribution arrangement. To support this characterization, plaintiff cites cases from other circuits but ignores controlling precedent in this circuit. *See Dart Indus., Inc. v. Plunkett Co. of Oklahoma, Inc.,* 704 F.2d 496, 499 (10th Cir.1983). *Accord Abadir & Co. v. First Miss. Corp.,* 651 F.2d 422, 428 (5th Cir. 1981) (horizontal *per se* rule should not be expanded to include manufacturers who compete with their distributors by distributing some of the manufacturers' own goods); *cf. Business Elecs. Corp. v. Sharp*

*Elecs. Corp.,* 485 U.S. at 726, 108 S.Ct. at 1520–21 (presumption in favor of a rule-of-reason standard, and a departure from that standard must be justified by demonstrable economic effect). In *Dart,* the Tenth Circuit held that a manufacturer's practice of selling directly to large accounts in a distributor's area or of taking over the accounts when the market price dropped below that shown on a rebate list did not constitute a horizontal customer allocation violative of antitrust laws. Rather, the manufacturer's practice of "selling directly to certain large accounts reflects a dual distribution system that standing alone, is perfectly lawful...." *Dart,* 704 F.2d at 499. The court characterized the dual distribution system as vertical, subject to the rule of reason. *Id.* Moreover, the Department of Justice stated in its vertical restraint guidelines: "Situations involving dual distribution have sometimes erroneously been characterized as horizontal, and subjected to a per se analysis, because the supplier also acts as dealer. However, the fact that a supplier also engages in distribution does not make a restraint horizontal." Vertical Restraint Guidelines, 50 Fed. Reg. 6263, 6265 (1985). Plaintiff claims that the conspiracy is horizontal because defendant reserved key accounts for itself. However, this does not prove *agreement between competitors* to allocate customers. I therefore conclude that any conspiracy was vertical in nature.

■ Plaintiff also argues that the present dual distribution arrangement is a *per se* violation of section 1 because it is anticompetitive in purpose and effect. "[A]greements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *accord National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (agreements are *per se* illegal only if their

"nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality"). However, in this circuit the *per se* rule applies to vertical restraints only if they include price-fixing motives. *Key Fin. Planning Corp.*, 828 F.2d at 640–41. To utilize the *per se* rule, plaintiff bears the burden of providing evidence of an express or implied agreement on price or price level. *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. at 735, 108 S.Ct. at 1525. Plaintiff has provided no evidence of an agreement on price, express or implied, between plaintiff and defendant, or between defendant and any other distributor. At best, plaintiff has produced some evidence of agreement to set nonprice restrictions—payment terms. However, agreement to set nonprice restriction are subject to the rule of reason. *Monsanto*, 465 U.S. at 760, 104 S.Ct. at 1469. Plaintiff has failed to prove that defendant's conduct falls within any of the *per se* categories. Thus, I apply the rule of reason.

 To prove its section 1 claim of market allocation under the rule of reason analysis, plaintiff must prove: (1) the existence of a contract or conspiracy to allocate customers and (2) that the contract or conspiracy had an adverse effect on competition. *See Monsanto*, 465 U.S. at 752, 104 S.Ct. at 1464 (1984); *National Soc'y of Professional Eng'rs*, 435 U.S. at 691, 98 S.Ct. at 1365 ("the inquiry mandated by the rule of reason is whether the challenged agreement is one that promotes competition or one that suppresses competition"). Defendant has argued that plaintiff has failed to meet its burden of proving conspiracy. Applying the previous analysis, plaintiff's evidence does not prove that defendant acted to allocate customers within the market. Defendant's conduct is consistent with legitimate business purposes. I thus conclude that plaintiff has failed to meet its burden of proving its section 1 allocation of market claim.

Moreover, there is an independent basis for granting summary judgment on plaintiff's section 1 claims under the rule of reason analysis. Plaintiff cannot prove an adverse effect on competition without a properly defined relevant product market. The effects on competition cannot be analyzed without first defining the market in which competition occurs—the so-called "relevant product market." Because a properly defined relevant product market is also critical to plaintiff's section 2 claims, I will analyze this issue in the context of plaintiff's section 2 monopolization claims.

*Monopolization Claims*

 Section 2 of the Sherman Anti-Trust Act forbids monopolization, combinations or conspiracies to monopolize, and attempts to monopolize. 15 U.S.C.A. § 2 (West 1988). To support its section 2 claims of monopolization, conspiracy to monopolize, and attempt to monopolize, plaintiff must prove that defendant had "the power to control price or exclude competition" in the relevant market. *United States v. E.I. du Pont de Nemours Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). A valid claim for monopolization or attempted monopolization must define the relevant product market. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *see also Key Fin. Planning Corp.*, 828 F.2d at 642–43 (10th Cir.1987) (relevant product market must be proven). Plaintiff must also properly define a relevant product market for the claim of conspiracy to monopolize. *See TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir.1992). The relevant market includes both product market and geographic market. *Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 654 (10th Cir.1992). Since the relevant geographic market is not disputed, this analysis focuses solely on the relevant product market, which is comprised of "commodities reasonably interchangeable by consumers for the same purposes...." *du Pont*, 351 U.S. at 395, 76 S.Ct. at 1007. Plaintiff has the burden of proving a properly defined relevant product market. *See Tarabishi v. McAlester Regional Hospital*, 951 F.2d

1558, 1568 (10th Cir.1991); *Key Fin. Planning Corp.*, 828 F.2d at 642–43.

██ Plaintiff's antitrust claims are based entirely on its definition of the relevant product market as a single product, Eccobond 56C, sold to a single customer, Thiokol Corporation. *Plaintiff's Response at 24; Pretrial Order at 2, 5; Defendant's Motion*, ex. 25 (Expert Witness Report of Dr. Maclyn Clouse). Defendant argues that a single trademarked product sold to one customer cannot as a matter of law constitute a relevant product market. While a single brand of product might, in limited circumstances, constitute a relevant market, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, —— U.S. ——, ——, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992), a single product *sold to a single customer,* given uncontested evidence of other consumers of that product, cannot represent the relevant product market. In *Kodak,* the Supreme Court emphasized the need to examine the choices available to the consumers (plural) of the particular product in order to define the relevant market. The Court, citing *United States v. Grinnell Corp.*, 384 U.S. 563, 572, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), stated that the "proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." Contrary to plaintiff's argument, *Kodak* does not permit a relevant market to be defined as one product sold to one customer. Rather, the relevant market in *Kodak* consisted of one brand of product sold to multiple customers, all of whom were Kodak equipment owners. Similarly, the relevant market must be based on an inquiry into the commercial realities faced by *all* the consumers of Eccobond 56C, not just one customer.

Plaintiff cannot artificially create antitrust claims by narrowly defining the relevant market to create the appearance of an antitrust injury. Plaintiff argues that the relevant market is Thiokol since only Eccobond 56C fit Thiokol's specifications for electrically conductive adhesives. I fail to see the logic in plaintiff's reasoning. Plaintiff does not deny that other customers purchase Eccobond 56C. I find no case supporting plaintiff's argument that one customer can constitute the relevant market when many other customers also purchase the same product. *See Telex Corp. v. IBM Corp.*, 510 F.2d 894, 917 (10th Cir.), *cert. denied*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). *Accord Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir.1978) (fact that one company limits its competitive activity to a single firm's products "cannot control the definition of the relevant market"), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). Supreme Court precedent indicates that the demands of all consumers must be analyzed, and the relevant market must include all consumers of the particular product. *See du Pont*, 351 U.S. at 393–95, 76 S.Ct. at 1006; *see also Sales and Advertising Promotion, Inc. v. Donrey, Inc.*, 598 F.Supp. 538, 548 (N.D.Okla. 1984) (court must examine commercial realities affecting all competition in the industry).

██ A relevant product market defined as one product sold to one customer does not make sense under the antitrust laws. When defining the relevant product market for the purposes of section 2, "there must be some allegation of a harmful effect on a more generalized market" than on one supplier. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir.1980). The mere decision by one consumer to purchase a specific product from one supplier is not monopolization in violation of section 2. As the Seventh Circuit has noted, "Otherwise the mere fact that one party bid successfully against another party for a contract would be equivalent to an anticompetitive effect and would raise the specter of an antitrust action being used as a remedy for any tortious conduct during the course of competition." *Id.* Such a result would contradict the "repeated view of the Supreme Court that the antitrust laws do 'not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Id.* (quoting *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 [1945] ). To permit so narrow a definition would have more of a tendency to discourage than protect competition since parties would be less

inclined to enter into contractual agreements. *See Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 559 (7th Cir. 1980).

In *Seidenstein v. National Medical Enters., Inc.*, 769 F.2d 1100 (5th Cir.1985), the Fifth Circuit affirmed a directed verdict on the question of relevant market. The district court held that cardiology services at a single hospital in El Paso, Texas, did not constitute a relevant product market because four other hospitals offered such services. *Id.* at 1106. Rather, the relevant market included cardiology services provided at all the hospitals in El Paso, and not just the services at the single hospital. *Id.* at 1105. Since plaintiff artificially limited its definition of the relevant market to one customer, the Seventh Circuit determined that, as a matter of law, plaintiff's definition of the relevant market was fatal to its antitrust claims.

The present facts are similar to those in *Seidenstein.* The record contains evidence that Eccobond 56C was sold to many consumers. *Defendant's Reply Brief in Support of its Motion for Summary Judgment*, ex. 2. (filed Sept. 3, 1991). According to plaintiff, defendant's products were " 'sole-sourced' at *numerous companies*, meaning that E & C products were the only product meeting the purchaser's specifications. Therefore, those *companies* have no choice but to buy E & C products. Thiokol was *one* such company." *Plaintiff's Response* at 27 (emphasis supplied); *see also Amended Complaint* ¶¶ 36, 77. Moreover, plaintiff itself sold Eccobond 56C to other companies, including Martin Marietta. *Plaintiff's Response* ¶ 72. Therefore, the relevant market must, at a minimum, include *all* consumers of Eccobond 56C. Plaintiff's section 1 allocation of market and section 2 claims are premised on the definition of the relevant market as one product sold to one customer. Since I conclude that plaintiff's definition of the relevant product market is untenable, I grant summary judgment in favor of the defendant on all of plaintiff's antitrust claims.

## State Law Claims

### Breach of Contract

■ Plaintiff's first breach of contract claim argues that defendant breached the written November 1, 1987, distributorship agreement. The agreement provided that it would expire as of November 1, 1988, unless it either was terminated before the end of one year or renegotiated for successive periods. The agreement was not terminated; however, plaintiff claims that the November 1, 1987, distributorship agreement was duly renegotiated by the parties in accordance with its terms. As evidence of renegotiation of the November 1, 1987, agreement, plaintiff argues that Bruce Coy "believed" that an agreement existed (*Plaintiff's Response* at 46, ex. 36 [Affidavit of Bruce Coy ¶ 15]); that E & C never informed Smalley that the agreement was *not* renegotiated (*Plaintiff's Response* at 46); and that the parties continued to operate in a distributorship relationship until December 7, 1989. These conclusory allegations do not constitute evidence of renegotiation. In responding to a motion for summary judgment, plaintiff must present admissible evidence of specific facts that constitute genuine issues for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Plaintiff's mere belief that renegotiation took place because it was never told to the contrary does not establish that the affirmative act of renegotiation ever occurred. Consequently, I conclude that the written distributorship agreement between the parties expired by its own terms as of November 1, 1988, and was never renegotiated.

Plaintiff's remaining breach of contract claims rely on one of two theories. First, plaintiff claims that the December 7, 1989, letter constitutes a written agreement to continue the distributorship for a period of six months. Second, plaintiff suggests that there was an implied contract between the parties due to their course of conduct after the expiration of the distributor agreement.

Concerning plaintiff's first theory, the December 7, 1989, letter states in part:

We *expect* to conclude our evaluations by June 1990. We will extend the present distributor relationship until our assessment program is complete, but in no event will our relationship extend beyond July 1, 1990 unless a new agreement is reached.

*Defendant's Motion,* ex. 31 (Letter from Fisher to Coy, dated Dec. 7, 1989) (emphasis supplied).

Viewing the evidence in the light most favorable to plaintiff, *Matsushita Elec. Indus. Corp. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), I assume that the December 7, 1989, letter constituted a written agreement between the parties to continue the distributorship relationship until E & C completed its evaluation of plaintiff. The plain language of this letter indicates that once evaluation was complete, E & C was no longer under any obligation to continue to extend the distributorship relationship. Only where language is ambiguous is it appropriate to look beyond the written terms of an agreement. *See Kuta v. Joint Dist. No. 50(J),* 799 P.2d 379, 382 (Colo. 1990), *reh'g denied,* (Colo.1990) (extrinsic evidence is only admissible to prove intent where terms of contract are ambiguous; fact that parties disagree as to contract's meaning does not in itself create ambiguity); *In re May,* 756 P.2d 362, 369 (Colo. 1988) (written contracts that are complete and free from ambiguity express intention of the parties and will be enforced according to their plain language). The interpretation of a written contract and the determination of whether a provision in a contract is ambiguous are questions of law. *Fibreglas Fabricators, Inc. v. Kylberg,* 799 P.2d 371, 374 (Colo.1990), *reh'g denied,* (Colo.1990).

The December 7, 1989, agreement provides that E & C may terminate the distributorship at any time after its evaluation of plaintiff is complete, but in no event will the agreement continue beyond July 1, 1990. I can find no other reasonable reading of the letter that preserves the plain meaning of the language of the agreement; moreover, plaintiff has failed to provide any alternate reading consistent with the words of the letter. Plaintiff's assertion that the letter created a binding obligation on E & C to continue the distributorship for a minimum of six months, regardless of whether E & C completed its evaluation in less than six months, is not supported by the language of the letter. Specifically, this interpretation disregards the word "expect" in the second to last sentence of the letter. If possible, effect should be given to every word, phrase, clause, and sentence of a contract when construing it. *F.W. Woolworth Co. v. Petersen,* 78 F.2d 47, 49 (10th Cir.1935). I therefore conclude that the December 7, 1989, letter did not create a binding obligation on E & C to continue its distributorship relationship with plaintiff for a minimum of six months. Once the evaluation was complete, E & C was free to terminate its distributorship relationship with plaintiff.

Concerning plaintiff's second theory, both parties concede that after the expiration of the distribution agreement on November 1, 1988, E & C and plaintiff continued in a course of conduct similar to their conduct under the written agreement. The letter of December 7, 1989, acknowledges that there was a "distributor relationship." *Defendant's Motion,* ex. 31. In addition, the letter of March 16, 1990, notifying plaintiff that the distribution relationship would be terminated effective April 30, 1990, acknowledges the existence of a continuing relationship between the parties up until that date. *Defendant's Motion,* ex. 12. Plaintiff, however, fails to demonstrate any breach of contract claim with regard to the implied relationship that existed between the parties. E & C did nothing from November 1, 1988, to December 7, 1989, to disturb this relationship. Then, on December 7, 1989, E & C notified plaintiff that it would continue the distribution relationship until its evaluation of plaintiff was complete. From December 7, 1989, to March 16, 1990, E & C likewise did nothing to disturb the parties' relationship. On March 16, 1990, defendant gave notice to plaintiff that the distributorship agreement would be terminated as of April 30, 1990.

Defendant continued to supply plaintiff with product and honor all contracts which plaintiff made through April 30, 1990. Plaintiff's argument stems solely from E & C's decision to terminate the distributorship relationship as of April 30, 1990. Plaintiff never asserts that defendant did not provide adequate notice of its intent to terminate the distributorship. Instead, plaintiff objects to the fact that E & C terminated the distributorship with plaintiff *at all. Plaintiff's Response* at 47. Both plaintiff's good faith and fair dealing claim and its violation of public policy claim are based on this contention. In order to prove that defendant acted in bad faith or abridged public policy, however, plaintiff assumes that it was successful in proving a violation of antitrust laws. As indicated earlier in this opinion, I have concluded that plaintiff failed to demonstrate any violation of the antitrust laws. Absent this violation, plaintiff offers no other facts suggesting that defendant acted in bad faith or contrary to public policy.

*Promissory Estoppel*

■ Under the doctrine of promissory estoppel, a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee, and which does induce such action or forbearance, is binding if injustice can be avoided only by enforcement of the promise. *Kiely v. St. Germain,* 670 P.2d 764, 767 (Colo.1983) (adopting Restatement (Second) of Contracts § 90[1]). The reliance must be reasonable and the action or forbearance taken as a result of the promise should be of a definite and material character. *Mountain Stone Co. v. H.W. Hammond Co.,* 39 Colo.App. 58, 564 P.2d 958, 960 (1977).

Plaintiff's promissory estoppel claim is based upon the December 7, 1989, letter. Plaintiff analyzes the letter in terms of two separate representations. First, plaintiff argues that it relied on the representation that the distributorship would continue until defendant's evaluation of plaintiff was complete. As indicated in the prior section, this is consistent with the plain meaning of the letter and it was reasonable to rely on

the representation. However, plaintiff must also prove it relied to its detriment on this promise. *Snow Basin, Ltd. v. Boettcher & Co.,* 805 P.2d 1151, 1155 (Colo. App.1990) (before plaintiff may recover upon theory of promissory estoppel, it must establish that it relied to its detriment on promise of another), *cert. denied,* (Colo. 1991).

■ Plaintiff offers as evidence of detrimental reliance the fact that (1) Bruce Coy met with Ed Poux of defendant with the aim of improving plaintiff's sales and (2) plaintiff "forbore from focusing the efforts of its personnel and the capital of the company on sales efforts for other products." *Plaintiff's Response* at 51. Neither of these contentions suggest that plaintiff was detrimentally harmed as a result of these actions. The meeting with Ed Poux did not result in plaintiff implementing changes which detrimentally affected plaintiff. Moreover, this meeting occurred during the evaluation period with the objective of securing a future contract with defendant. A meeting with the goal of securing future business does not constitute detrimental reliance. If this were the case, then any action by a business with the aim of securing future business could give rise to a detrimental reliance claim when the future business did not materialize. Plaintiff has offered no evidence that defendant ever intended to award plaintiff a future distributorship, despite its representations in the December 7, 1989, letter. On the contrary, plaintiff concedes that defendant has continued to honor all contracts which plaintiff made during the period from December 7, 1989, to April 30, 1990. Therefore, I conclude that plaintiff's promissory estoppel claim based on this interpretation of the December 7, 1989, letter fails since plaintiff has not demonstrated any detrimental reliance.

Plaintiff also bases its promissory estoppel claim on its interpretation of the December 7, 1989, letter as a binding agreement that the distribution agreement would continue for a minimum period of six months. *Plaintiff's Response* at 49. As indicated in the prior section, this interpre-

tation of the December 7, 1989, letter is untenable. Reliance on a promise must be reasonable in order to establish a promissory estoppel claim. *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900, 905 (Colo.1982). Moreover, defendant correctly argues that even if this interpretation of the December 7, 1989, letter were reasonable, plaintiff has failed to prove that any detrimental reliance occurred because the agreement was terminated 61 days "early." Accordingly, I grant defendant's motion for summary judgment on the promissory estoppel claim.

*Colorado Restraint of Trade Act Claim*

Although defendant moved for summary judgment on both the federal and state antitrust claims, *Defendant's Motion For Summary Judgment*, ¶¶ 1–3, defendant failed to independently analyze the state law claim in its supporting brief. Because the Colorado Restraint of Trade and Commerce law, Colo.Rev.Stat. § 6–4–101 to 108 (Colorado Antitrust Act), is essentially identical to the federal antitrust statutes and plaintiff has failed to articulate a single instance in which the Colorado statute substantively departs from its federal counterparts, I conclude that defendant's failure to separately analyze the state claim from the federal claim does not preclude the court's disposition of the state law claim.

The Colorado antitrust statute was modeled after the substantive provisions of Wisconsin's antitrust statute, Wis. Stat.Ann. § 133.01 (1939), which is based upon the Sherman Anti-trust Act of 1890 (codified, as amended, at 15 U.S.C.A. § 1 [West 1982]), and its companion, the Clayton Act of 1914 (codified, as amended, at 15 U.S.C.A. § 12 [West 1982]). The Colorado Supreme Court examined the interrelationship between the Colorado act and its federal counterparts in *People v. North Ave. Furniture & Appliance, Inc.*, 645 P.2d 1291 (Colo.1982) (en banc). The court reasoned:

> Given the substantial similarity in text and purpose present in the federal and state antitrust statutes, we believe that federal decisions construing the Sherman

and Clayton Acts, although not necessarily controlling on our interpretation of the Colorado law, are nevertheless entitled to careful scrutiny in determining the scope of the state antitrust statute. *Id.* at 1295–96. Federal cases construing the Sherman and Clayton Acts, although not controlling, are entitled to careful scrutiny in resolving issues arising under Colorado's antitrust statute. *People ex rel. Woodward v. Colorado Springs Bd. of Realtors, Inc.*, 692 P.2d 1055, 1060 (Colo. 1984); *Winther v. DEC International, Inc.*, 625 F.Supp. 100, 103–04 (D.Colo.1985) (since the purpose of the state and federal antitrust laws is identical, the two have similar standing requirements). The views articulated in these decisions were codified in the Colorado Antitrust Act of 1992. The Colorado legislature added section 6–4–119, "Interpretation," which reads:

> It is the intent of the general assembly that, in construing this article, the courts shall use as a guide interpretations given by the federal courts to comparable federal antitrust laws.

Colo.Rev.Stat. § 6–4–119 (Supp.1992). Because both the case law and the legislative history suggest that the federal and state statutes should be construed together, my analysis on plaintiff's federal antitrust claims applies equally to the state law antitrust claim. Accordingly, summary judgment is granted on the state law antitrust claim.

*Tortious Interference Claim*

Plaintiff confesses summary judgment on its tortious interference with contract claim. I therefore grant defendant's motion for summary judgment on this claim.

Upon the foregoing findings and conclusions, it is therefore

ORDERED that defendant's motion for summary judgment is granted and plaintiff's claims are dismissed. Defendant shall recover its costs.