**DAURO ADVERTISING,
INC., Plaintiff,**

v.

**GENERAL MOTORS CORPORATION,
a Delaware Corporation,
Defendant.**

No. Civ.A. 99–D–1263.

United States District Court,
D. Colorado.

Nov. 24, 1999.

Jeffrey A. Chase, Elizabeth L. Smith, Jacobs, Chase, Frick, Kleinkopp & Kelley, L.L.C., Denver, CO, for plaintiff.

Gale T. Miller, Davis, Graham & Stubbs, L.L.P., Denver, CO, William B. Slowey, Dennis A. White, General Motors Corporation, Detroit, MI, for defendant.

## ORDER

DANIEL, District Judge.

THIS MATTER is before the Court on the Defendant's Motion to Dismiss filed September 8, 1999. The Court has fully considered the motion, heard argument from the Plaintiff's and Defendant's counsel on November 17, 1999, and concludes, for the reasons stated herein, that the Defendant's motion should be denied.

## BACKGROUND

The Plaintiff, Dauro Advertising, Inc. ("Dauro"), is an advertising agency incorporated in Colorado. The Defendant, General Motors Corporation ("GM"), is incorporated under the laws of Delaware. The Plaintiff services the advertising interests of a variety of businesses and clientele throughout the United States. The bulk of Dauro's work, and its primary source of revenue has been derived from the advertising work it performs for GM dealers and the various GM Dealer Marketing Groups ("DMGs") which service the advertising needs of GM's dealers. The DMGs were funded by voluntary assessments that member dealers agreed to pay when purchasing new automobiles from GM. By the late 1980's, the dealers' voluntary assessments generally equaled or exceeded one percent of the manufacturer's suggested retail price of new cars purchased. In the late 1980's and early 1990's dealer participation was entirely optional. The GM dealers could elect to contribute the one percent per vehicle, with GM distributing those funds to the dealers' DMG for advertising in the local market, or the dealers could elect to participate and advertise on their own.

In early 1990, Dauro began to service the advertising needs of various GM dealers and GM DMGs throughout the country. The Complaint alleges that by 1997 Dauro had billings in connection with GM clients in excess of $9,000,000.00, and that, at times relevant to this lawsuit, over 90

percent of Dauro's annual gross revenues were derived from GM dealers and DMGs.

In 1993, GM announced its objective to have all advertisements for GM cars and trucks speak in "one voice." The Complaint alleges that GM's implementation of the "one voice" initiative was a sham operation designed to foreclose competition for advertising services for GM cars and trucks. GM implemented a process by which several "key" or "select" advertising agencies would be chosen to do the majority of the advertising work for GM's respective divisions. Under the new "key" or "select" agency program, the GM dealers were encouraged to utilize the identified agencies for their advertising needs. As a result of this process, Dauro alleges that it lost all of its Cadillac accounts and its Oklahoma Buick account.

On April 1, 1999, GM implemented a new Field Market Strategy Program. Under the Strategy Program, GM still collects the one percent per vehicle contribution that was formerly returned to either the Dealers or their respective DMGs for advertising in their local markets. Instead of returning the contribution, however, the contribution is—retained by GM and spent on national advertising for GM products. The GM dealers are required to participate in the Strategy Program. Dauro alleges that as a result of the implementation of the Strategy Program, it has lost all but one of the remaining accounts that it had with the various GM DMGs.

The Complaint alleges that GM's Strategy Program implicates the tying of a distinct product (GM cars and trucks) to a distinct service (advertising for GM cars and trucks). The Complaint also alleges that the market for the tying product (GM cars and trucks) is separate and distinct from the market for the tying item (advertising for GM cars and trucks), and that GM has sufficient market power with respect to the tying product to force GM dealers to purchase the tying item. Consequently, the Complaint pleads three claims of relief: (1) Illegal Restraint of Trade in Violation of 15 U.S.C. § 1; (2) Illegal Restraint of Trade in Violation of C.R.S. § 6–4–104; and (3) Tortious Interference With Ongoing and Business Relations.

## ANALYSIS

### I. Defendant's Motion to Dismiss.

#### A. Standard.

If, accepting all well-pleaded allegations as true and drawing all reasonable references in favor of the plaintiff, it appears beyond doubt that no set of facts entitle plaintiffs to relief, then the court should grant a motion to dismiss. See Tri-Crown, Inc. v. American Fed. Sav. & Loan Ass'n, 908 F.2d 578, 582 (10th Cir. 1990). A complaint must be dismissed if, accepting the allegations as true, it appears beyond doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Meade v. Grubbs, 841 F.2d 1512, 1526 (10th Cir. 1988).

"A complaint may be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) only 'if the plaintiff can prove no set of facts to support a claim for relief.'" Trierweiler, 90 F.3d at 1533. (quoting Jojola v. Chavez, 55 F.3d 488, 490 (10th Cir.1995)). The court "'must accept all the well-pleaded allegations as true and must construe them in the light most favorable to the plaintiff.'" David v. City and County of Denver, 101 F.3d 1344, 1352 (10th Cir.1996) (quoting Gagan v. Norton, 35 F.3d 1473, 1474 n. 1 (10th Cir.1994)).

#### B. Antitrust Standing.

 "To maintain standing to bring an antitrust claim under § 4 of the Clayton Act, 15 U.S.C. § 15, a plaintiff must show (1) an 'antitrust injury;' and (2) a direct causal connection between that injury and defendant's violation of the antitrust laws." Sports Racing Services, Inc. v. Sports Car Club of America, 131 F.3d 874, 882 (10th Cir.1997). To meet the first prong, the plaintiff must allege a business or property injury, an antitrust injury, as defined by

the Sherman Act. *Id.* "An antitrust injury is defined as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. A violation of the Act without resultant injury to the plaintiffs is insufficient to confer standing." *Id.* (citation omitted). To satisfy the second prong, the plaintiff must show the antitrust injury resulted directly from the defendant's violation of antitrust law. *Id.* (citation omitted).

When evaluating antitrust standing, factors to consider include:

(1) the causal connection between the alleged antitrust violation and the harm; (2) improper motive or intent of defendants; (3) whether the claimed injury is one sought to be redressed by antitrust damages; (4) the directness between the injury and the market restraint resulting from the alleged violation; (5) the speculative nature of the damages claimed; and (6) the risk of duplicative recoveries or complex damage apportionment.

*Id.* (internal citations omitted). These factors are not black letter rules, however, "but merely 'give more specificity to the inquiry mandated by the two part test.'" *Id.* (citing *Sharp v. United Airlines, Inc.,* 967 F.2d 404, 406 n. 2 (10th Cir.1992)).

An analysis of the standing issue in the instant case in light of the two part antitrust standing test and the six enumerated factors leads me to the conclusion that the Plaintiff has standing to bring this antitrust case.

In terms of the first prong of the standing test, Dauro alleges that as a result of the implementation of the Strategy Program, it has lost all but one of the remaining accounts that it had with the various GM DMGs. Although the Plaintiff was not the party that would be required to pay the incremental costs of the price increase, the Complaint alleges that "Dauro Advertising alone will lose over $1,000,000.00 in commissions this year as a result of the implementation of the Strategy Program." Complaint at 10, ¶ 50. Constru-

ing the facts alleged in the Complaint in the light most favorable to the Plaintiff, this is a business or property injury resulting directly from the Defendant's alleged violation of antitrust law. Therefore, the Plaintiff has alleged sufficient facts to establish standing in its Complaint. Consequently, the Motion to Dismiss must be denied on this basis.

"The Sherman Act ultimately must protect competition, not a competitor, and were we tempted to collapse the distinction, we would distort its continuing viability to safeguard consumer welfare." *SCFC ILC, Inc. v. Visa USA, Inc.,* 36 F.3d 958, 972 (10th Cir.1994). Also, "[t]he Supreme Court has consistently held that only direct purchasers suffer injury within the meaning of § 4 of the Clayton Act." *Sports Racing Services, Inc.,* 131 F.3d at 883. Here, the Defendant asserts that the loss of income suffered by the Plaintiff was only tangentially related to the GM implementation of the Strategy Program and that this is not an injury of the type the antitrust laws were intended to prevent. I disagree.

In antitrust cases, where the proof is largely in the hands of the alleged conspirators, "dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Applying this rigorous standard, although the Defendant's argument may have credence at the summary judgment stage, this case is not one in which dismissal should be granted on the basis of a lack of standing. Consequently, the Defendant's motion with respect to the Plaintiff's federal illegal restraint of trade claim still must be denied on the basis of standing.

### C. *Unlawful Tying Claim.*

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or

at least agrees that he will not purchase that product from any other supplier." *Sports Racing Services, Inc.*, 131 F.3d at 886 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)). Generally, a tying arrangement is illegal under Section 1 of the Sherman Act if the following can be shown: (1) two separate products or services are involved; (2) the sale or agreement to sell one product or service is conditioned on the purchase of another; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a not insubstantial amount of interstate commerce in the tied product is affected. *Id.* (citations omitted).

■ In this case, the Complaint alleges that GM's Strategy Program implicates the tying of a distinct product (GM cars and trucks) to a distinct service (advertising for GM cars and trucks). Thus, two separate products or services are involved. Additionally, the Complaint alleges that prior to GM's implementation of the Strategy Program, the GM dealers purchased cars and trucks from GM and advertising services separately and that GM is charging a one percent contribution per vehicle for advertising services. Therefore, the sale or agreement to sell one product or service is conditioned on the purchase of another. Finally, the Complaint alleges that GM has sufficient market power in the alleged relevant market, the market for GM cars and trucks, to require the GM dealers to pay higher prices to cover the national advertising. As a result, GM has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market. Consequently, the Complaint alleges sufficient facts to satisfy the requirements for an unlawful tying claim with respect to the Plaintiff's federal illegal restraint of trade claim.

### D. *Proper Relevant Product Market.*

Market definition is a question of fact. *Westman Comm. Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220 (10th Cir.1986). As the Supreme Court has noted:

> A retail seller may have in one sense a monopoly on certain trade because of location, as an isolated country store or filling station, or because no one else makes a product of just the quality or attractiveness of his product, as for example in cigarettes. Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufactures have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392–93, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Defining the relevant market first necessitates an examination of which commodities are "reasonably interchangeable by consumers for the same purposes." *Id.* at 1221 (citing *E.I. du Pont de Nemours & Co.*, 351 U.S. at 395, 76 S.Ct. 994). Here, the GM dealers are the consumers adversely affected by the Strategy Program. GM dealers have no interest in purchasing cars or trucks from any other manufacturer. Therefore, cars and trucks from manufacturers other than GM are not reasonably interchangeable. Thus, the Plaintiff has alleged sufficient facts in its Complaint to define a relevant market. Consequently, the Complaint's federal illegal restraint of trade claim should not be dismissed on this basis.

### E. *Type of Injury That the Antitrust Laws Were Intended to Prevent.*

As previously noted, "[a]n antitrust injury is defined as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Sports Racing Services, Inc.*, 131 F.3d at 882. Although

the Plaintiff was not the party that would be required to pay the incremental costs of the price increase, the Complaint alleges that "Dauro Advertising alone will lose over $1,000,000.00 in commissions this year as a result of the implementation of the Strategy Program." Complaint at 10, ¶ 50. Construing the facts alleged in the Complaint in the light most favorable to the Plaintiff, this is a business or property injury resulting directly from the Defendant's alleged violation of antitrust law. Consequently, the Complaint's federal illegal restraint of trade claim should not be dismissed on this basis.

### F. The Colorado Antitrust Act.

The language of C.R.S. § 6–4–104 is virtually identical to Section 1 of the Sherman Act. See C.R.S. § 6–4–104. Consequently, because both the case law and the legislative history suggest that the federal statutes should be construed together, analysis on a plaintiff's federal antitrust claims applies equally to state law antitrust claims. See Smalley & Co. v. Emerson & Cuming, Inc., 808 F.Supp. 1503, 1516 (D.Colo.1992). As a result, my analysis above with respect to the federal illegal restraint of trade claim is equally applicable to the Colorado illegal restraint of trade claim. Consequently, dismissal of the Complaint's Colorado illegal restraint of trade claim is not appropriate.

### G. Tortious Interference Claim.

In determining whether an actor's conduct is wrongful, the Colorado courts consider the following factors:

(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

Westfield Dev. Co. v. Rifle Inv. Assoc., 786 P.2d 1112, 1118 (Colo.1990). In this case,

the Complaint alleges that GM sold advertising services to its dealers, through the one percent contribution, as a condition of the GM dealers ability to purchase GM cars and trucks. This is an unlawful tying claim. Therefore, construing the facts alleged in the Complaint in the light most favorable to the Plaintiff, GM engaged in improper conduct. Consequently, granting the Defendant's motion to dismiss as to the Plaintiff's Tortuous Interference Claim is not appropriate. Accordingly, it is

ORDERED that the Defendant's Motion to Dismiss filed September 8, 1999 is DENIED.